- September 8, 2008 - £60,000 sterling

These payments were over and above payments for C.A.S. Hewlett's audit services from SFGL's Trustmark account, and FTI has located no allocation records for these payments.

30.     The additional payments noted in paragraph 29 are important in considering the efficacy and legitimacy of the audits of SIB by C.A.S. Hewlett as both International Auditing Standards and FRSC regulations require that audits be "independent." Based on our investigation, C.A.S. Hewlett appears not to have audited the vast majority of SIB's reported investments, even though they comprised 90% or more of SIB's assets.   Based on that fact, coupled with the large payments to C.A.S. Hewlett apparently unconnected with its audit fees, it appears that C.A.S. Hewlett's independence as an auditor of SIB was severely compromised.

### SIB's FINANCIAL STATEMENTS WERE "REVERSE-ENGINEERED" FROM AT LEAST 1999 FORWARD

31.     Davis states in his plea agreement that as far back as at least 1999 assets were inflated to offset CD obligations and that revenue was "reverse-engineered" to arrive at desired levels. KVT-24, pp. 12-15. My findings are consistent with those admissions.

32.     We found within SIB's accounting records worksheets used to derive fictitious SIB revenue.  The Ponzi scheme conspirators would simply determine what level of fictitious revenue and assets SIB needed to report in order to both look good to investors and regulators and purport to cover its CD obligations and other expenses.  They would then back into that total amount by assigning equally fictitious revenue amounts to each category (equity, fixed income, precious metals, alternative, etc.) of a fictitious investment allocation.

33.     Based on our review of the worksheets used to derive the fictitious revenue amounts associated with those files, after comparing the figures in the spreadsheets to revenue figures reported on SIB's trial balance and financial statements, and after considering the

statements made by James Davis, I have concluded that such worksheets were used to generate, or "reverse-engineer," false revenue figures back to at least 1999.

### SIB WAS INSOLVENT FROM AT LEAST 1999 FORWARD

34.     At the inception of the U.S. Receivership on February 16, 2009, SIB's total obligation to CD holders was approximately $7.2 billion (U.S.), versus reported investments valued at $8.3 billion as of December 31, 2008. Based on my analysis, the market value of all assets for all Stanford Entities (including SIB) combined total less than $1 billion. At the time SIB was placed into receivership, SIB was insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) by more than $6 billion.

35.     Through further analysis of SIB's financial records, FTI has determined that SIB was insolvent by at least 1999 forward. SIB's reported assets consisted overwhelmingly of "financial assets" and cash. The published balance sheets represented that "financial assets" were reported at "fair value." Of course, cash, by definition, is stated at fair value (assuming correct reporting). We know, however, from our investigation and review of internal SIB records that the fair value of the SIB financial assets was much smaller than reported.

36.     Each year, from 1999 forward, SIB's reported asset totals included, without disclosure to the public, outstanding loans or notes receivable from Allen Stanford. SIB's financial records show that Allen Stanford's outstanding loan balances for the years 1999 through 2008 were at least as follows:

- December 31, 1999 - $52 million

- December 31, 2000 - $59.5 million

- December 31, 2001 - $112 million

- December 31, 2002 - $168 million

- December 31, 2003 - $335 million

- December 31, 2004 - $539 million

- December 31, 2005 - $630 million

- December 31, 2006 - $1.25 billion

- December 31, 2007 - $1.45 billion

- December 31, 2008 - $1.79 billion

37.     The loans noted above have been deducted from the assets totals contained in SIB's published financial statements to determine SIB's solvency, since we have concluded that Allan Stanford was either unable to pay the loans back or never intended to do so. As of the date of the Receivership, Mr Stanford was unable to repay the $1.8 billion loan, and he has stated numerous times that he lacked even sufficient assets to pay for his defense. As noted below, the aggregate amount of non-Stanford income that Mr. Stanford claimed on his tax returns from 1999 through 2007 did not accumulate enough to allow him to buy a house, let alone pay back the SIB loans ranging from $52 million to $1.8 billion. These notes were not disclosed to investors or even outside Allen Stanford's inner circle, and they were not separately noted in his tax returns as they should have been, which is discussed further below. The notes were always short term (due within one year), though never repaid, and they were unsecured by any other assets held by Mr. Stanford. The way in which these loans were recorded into the financial statements are not indicative of an appropriate arms-length transaction with a shareholder; instead, they were simply bookkeeping entries to cover up that SIB was sending funds to other Stanford Entities and to Allen Stanford. These loans to Mr. Stanford, which were classified by SIB as "financial assets at fair value," were inconsistent with the types of investments disclosed by SIB to investors. Therefore, these loans are considered uncollectible and have been deducted from the asset totals in SIB's financial statements in determining its solvency.

38.     When the above loan balances are deducted from the asset totals contained in SIB's published financial statements, I conclude that, from at least 1999 forward, SIB's reported liabilities exceeded the fair value of its assets and SIB was therefore insolvent.  The following table shows, for the years 1999 through 2008, the fair market value of SIB's assets (as reported by SIB), excluding the loans to Allen Stanford, compared to the total reported liabilities of SIB.

| Date | Adjusted Assets | Total Liabilities | Surplus/(Deficit) |
|------|-----------------|-------------------|-------------------|
| 12/31/1999 | 623,893,966 | 628,067,020 | (4,173,054) |
| 12/31/2000 | 771,203,204 | 777,863,293 | (6,660,089) |
| 12/31/2001 | 1,085,830,292 | 1,122,829,384 | (36,999,092) |
| 12/31/2002 | 1,545,755,342 | 1,613,048,535 | (67,293,193) |
| 12/31/2003 | 1,890,506,026 | 2,090,477,407 | (199,971,381) |
| 12/31/2004 | 2,547,247,277 | 2,839,878,864 | (292,631,587) |
| 12/31/2005 | 3,428,961,957 | 3,776,659,957 | (347,698,000) |
| 12/31/2006 | 4,082,245,061 | 5,025,014,250 | (942,769,189) |
| 12/31/2007 | 5,603,317,128 | 6,702,960,952 | (1,099,643,824) |
| 12/31/2008 | 5,966,542,565 | 7,435,718,727 | (1,469,176,162) |

39.     When the above-referenced loan balances are deducted from SIB's asset totals from 2000 forward, SIB's CD liabilities alone exceeded the fair market value of its assets.  The following table shows, for the years 2000 through 2008, the fair market value of SIB's assets (as reported by SIB), excluding the loans to Allen Stanford, compared to the CD liabilities of SIB.

| Date | Adjusted Assets | CD Deposits | Surplus/(Deficit) |
|---|---|---|---|
| 12/31/2000 | 771,203,204 | 772,261,025 | (1,057,821) |
| 12/31/2001 | 1,085,830,292 | 1,116,454,586 | (30,624,294) |
| 12/31/2002 | 1,545,755,342 | 1,606,062,398 | (60,307,056) |
| 12/31/2003 | 1,890,506,026 | 2,083,397,998 | (192,891,972) |
| 12/31/2004 | 2,547,247,277 | 2,827,941,493 | (280,694,216) |
| 12/31/2005 | 3,428,961,957 | 3,763,011,041 | (334,049,084) |
| 12/31/2006 | 4,082,245,061 | 5,010,083,767 | (927,838,706) |
| 12/31/2007 | 5,603,317,128 | 6,689,964,304 | (1,086,647,176) |
| 12/31/2008 | 5,966,542,565 | 7,431,630,364 | (1,465,087,799) |

### FROM AT LEAST 1999 FORWARD, ALLEN STANFORD'S REPORTED INCOME WAS BASED ALMOST EXCLUSIVELY ON FUNDS FROM THE STANFORD ENTITIES

40.     Based on a review of records relating to the Stanford Entities and tax returns obtained from the IRS for Allen Stanford for the years 1999 through 2007, Allen Stanford received very little income from any source other than the Stanford Entities. In three out of nine years covered by the tax returns, his non-Stanford income was less than $50,000. For two additional years, it was under $100,000. Even for years when he received over $100,000 in non-Stanford income, that income exceeded 2% of his total income only one time -- in 2005, when his non-Stanford income was 5.02% of his total income.[5] The following table shows Allen

---

[5]  The bulk of the non-Stanford income for 2005 was a capital gain in the amount of $2,600,620. Although we have classified this amount as non-Stanford income, we actually do not have any information showing the source of that capital gain. Thus, the capital gain may well be traceable to a source associated with the Stanford Entities.

Stanford's income for the years 1999 through 2007, broken down between income that came from the Stanford Entities and income that came from some other external source.

| Year | Reported Income | | | Percent of Reported Income | |
|------|----------|--------------|------------|------------|--------------|
| | Stanford | Non-Stanford | Total | Stanford % | Non-Stanford % |
| 1999 | 5,364,783 | 69,926 | 5,434,709 | 98.71% | 1.29% |
| 2000 | 7,390,052 | 21,672 | 7,411,724 | 99.71% | 0.29% |
| 2001 | 15,828,358 | 136,774 | 15,965,132 | 99.14% | 0.86% |
| 2002 | 27,691,286 | 27,257 | 27,718,543 | 99.90% | 0.10% |
| 2003 | 36,770,949 | 41,093 | 36,812,041 | 99.89% | 0.11% |
| 2004 | 298,180,436 | 85,052 | 298,265,488 | 99.97% | 0.03% |
| 2005 | 50,291,392 | 2,656,808 | 52,948,200 | 94.98% | 5.02% |
| 2006 | 43,302,997 | 457,342 | 43,760,339 | 98.95% | 1.05% |
| 2007 | 81,053,128 | 15,231 | 81,068,359 | 99.98% | 0.02% |
| Grand Total | 565,873,381 | 3,511,155 | 569,384,535 | 99.38% | 0.62% |

    41.    The reported income from Stanford Entities and non-Stanford sources in the above paragraph do not show all of the Stanford funds provided to Allen Stanford. In particular, Schedule F of IRS Form 5471, which was filed by Mr. Stanford for each year from 1999 through 2007, requires that the filer record information regarding loans to stockholders and other related persons. Mr. Stanford, however, failed to record any of his SIB loans on this line item. In fact, from 1999 through 2007, Mr. Stanford never had enough reported income to repay the SIB loans that he had received. For example, in 2003 the amount due on the loan from SIB to Mr. Stanford was approximately $335 million, while the cumulative reported income from all years 1999

through 2003 was only approximately $93 million — a full $242 million less than the amount due on his SIB loan.

42.    Moreover, Mr. Stanford diverted millions of dollars to his personal bank accounts from SFGL's SocGen Account, which account James Davis said, in his plea agreement, was both "secret" and funded by CD investor funds.  KVT-24, p. 15.  Based on the SocGen records filed by the DOJ, Mr. Stanford transferred over $78 million from the SocGen Account to his personal accounts between 2000 and 2006, specifically:

- 2000 - $8.9 million
- 2001 - $500,000
- 2002 - $5 million
- 2003 - $39.5 million
- 2004 - $18 million
- 2006 - $6.5 million

43.    If you exclude any reported income known to be from the Stanford Entities, Mr. Stanford received only $3,511,155 from other sources between 1999 and 2007.  In fact, between 1999 and 2004, his non-Stanford income totaled only $381,774.  Although I do not have access to records concerning all personal expenses incurred by Allen Stanford during this time period, we learned that he purchased a yacht known as the Sea Eagle in November 2002 for $3.9 million, an amount that exceeds the total non-Stanford reported income Mr. Stanford received between 1999 and 2007.  *See* KVT-27.  Mr. Stanford's non-Stanford reported income does not even begin to cover the costs of the yacht.  In addition, over $18 million was spent to refurbish the Sea Eagle between June 2003 and February 2005.  *See* KVT-38.

44.    Although I do not have access to every record of Mr. Stanford's personal expenses incurred during this time period, our investigation has revealed that the vast majority of

expenses that Mr. Stanford incurred, even for items or property used only for personal purposes, was actually paid by one or more of the Stanford Entities.  Just by way of example, Stanford Development Corporation purchased a home for Mr. Stanford and his wife in 1999 for a price of at least $2.15 million, which far exceeds his non-Stanford reported income not only for 1999 but for the entire period of 1999 through 2004.  *See* KVT-28.

### LOANS FROM SIB AND TRANSFERS FROM THE SOCGEN ACCOUNT TO ALLEN STANFORD WERE FRAUDULENT

45.     As discussed in detail above, Allen Stanford received over $78 million from SFGL's SocGen Account and approximately $1.8 billion in loans from SIB.  I have reviewed section 24.005 of the Texas Uniform Fraudulent Transfer Act.  *See* TEX. BUS. & COMM. CODE ANN. § 24.005.  In particular, subsection (b) to section 24.005 provides a non-exhaustive list of eleven "badges of fraud" that may be used to determine whether a transfer was made with actual intent to hinder, delay, or defraud creditors.  I have determined that most of these badges of fraud are present in the transfers of loans and SocGen funds to Allen Stanford, as follows:

- The transfers of such funds were to an insider — namely Allen Stanford, owner of all Stanford Entities.

- Allen Stanford, who is a debtor himself, retained possession and control of the funds after the transfers and absconded with such funds.

- SIB, SFGL, and Allen Stanford removed the assets transferred to Allen Stanford, and they and other accomplices concealed the transfers of such assets.

- SIB and SFGL did not receive consideration that was reasonably equivalent to the value of the funds transferred to Allen Stanford; in particular, Allen Stanford's promissory notes were of no real value to SIB.

- SIB was insolvent when the transfers were made to Allen Stanford.

- SIB's transfer of funds to Allen Stanford occurred on or around the time that Allen Stanford incurred a substantial debt to repay SIB pursuant to the loans or notes receivable.

**SFGC'S INCOME CAME ALMOST EXCLUSIVELY FROM THE STANFORD ENTITIES, WITHOUT WHICH IT WAS INSOLVENT**

46.     Likewise, without funds from other Stanford Entities, SFGC was insolvent from at least 2000 forward.  SFGC was created for the purpose of providing services to SGC, SIB and other Stanford Entities.  During the course of our entire investigation since February 2009, we have located no evidence which even suggests SFGC received any significant funds from sources other than the Stanford Entities.  I have stated in my prior declarations that the Stanford Entities were funded primarily by the proceeds from the sale of SIB CDs.  *See* KVT-26.  Accordingly, without the funds supplied by the Stanford Entities, SFGC was insolvent from at least 2000 through February 16, 2009.

Executed this 11th day of March 2011.

_____

Karyl Van Tassel

# KVT-5

Sanctions Compliance Portal

Page 1 of 1

**Transaction Type : Account**
**View Blocked / Rejected Transaction**

| | | | |
|---|---|---|---|
| Block/Reject Date | 03/01/2011 | Maker SOEID | pf03224 (PATRICIA FLORES) |
| ID# | A110301000051944 | Reporting Unit | North America Region |
| Status | Approved | Citi Entity | Citibank N.A. |
| Date Reported to OFAC | 03/01/2011 | License Id | Not Applicable |
| Type | Blocked | | |
| Reason for Blocking | -Entity Majority Owned by SDN | Matching Entry | LIBYAN INVESTMENT AUTHORITY (a.k.a. LIA; a.k.a. Libyan Foreign Investment Company; a.k.a. LFICO; a.k.a. Libyan Arab Foreign Investment Company; a.k.a. LAFICO) |
| Field/(s) Matching | -ACCOUNT OWNER / ACCOUNT PARTY NAME | | |
| Sanctions Program | Libya | Account Number | ▮ |
| Account type | Security cash account | Account Owner / Account Party Name | Libya Investment Authority |
| Amount | 2,798,901.00 | Currency | USD: US Dollar |
| USD Equivalent | $ 2,798,901.00 | | |
| Notes/Details | BLCOKED ACCOUNT: 203825 HSBC SECURITIES SERVICES (LUXEMBOURG) S.A.-NRA ORIGINAL ACCOUNT: 091677 HSBC SECURITIES SERVICES (LUX) HSBC SECURITIES SERVICES (LUXEMBOURG) S.A.-NRA HSBC SECURITIES SERVICES (LUXEMBOURG) S.A.-NRA | Attachments (Optional) | None |
| Also blocked under | N/A | | |

Sanctions Compliance Portal                                                      Page 1 of 1

**Transaction Type : Account**

**View Blocked / Rejected Transaction**

| | | | |
|---|---|---|---|
| **Block/Reject Date** | 03/01/2011 | **Maker SOEID** | jg59525 (JOHN GADZIALA) |
| **ID#** | A110301000051943 | **Reporting Unit** | North America Region |
| **Status** | Approved | **Citi Entity** | Citibank N.A. |
| **Date Reported to OFAC** | 03/01/2011 | **License Id** | Not Applicable |
| **Type** | Blocked | | |
| **Reason for Blocking** | -Entity Majority Owned by SDN | **Matching Entry** | LIBYAN INVESTMENT AUTHORITY (a.k.a. LIA; a.k.a. Libyan Foreign Investment Company; a.k.a. LFICO; a.k.a. Libyan Arab Foreign Investment Company; a.k.a. LAFICO) |
| **Field/(s) Matching** | -ACCOUNT OWNER / ACCOUNT PARTY NAME | | |
| **Sanctions Program** | Libya | **Account Number** | ▮▮▮▮ |
| **Account type** | Securities | **Account Owner / Account Party Name** | Libyan Investment Authority |
| **Amount** | 1,370,350,417.00 | **Currency** | USD: US Dollar |
| **USD Equivalent** | $ 1,370,350,417.00 | | |
| **Notes/Details** | BLCOKED ACCOUNT: 203825 HSBC SECURITIES SERVICES (LUXEMBOURG) S.A.-NRA ORIGINAL ACCOUNT: 091677 HSBC SECURITIES SERVICES (LUX) Securities moved from HSBC omnibus account 091677 for blocking. | **Attachments (Optional)** | None |
| **Also blocked under** | N/A | | |

# KVT-6

# The Telegraph

# TECHNOLOGY TO TOURISM: HEAD OF INVESTMENT AUTHORITY DISCUSSES OPPORTUNITIES FOR U.S. BUSINESS IN LIBYA

Passed to the Telegraph by WikiLeaks
9:33PM GMT 31 Jan 2011

**Ref ID:** 10TRIPOLI79

**Date:** 1/28/2010 15:14

**Origin:** Embassy Tripoli

**Classification:** CONFIDENTIAL

**Destination:**

**Header:** VZCZCXRO0479OO RUEHTRODE RUEHTRO #0079/01 0281514ZNY CCCCC ZZHO R 281514Z JAN 10FM AMEMBASSY TRIPOLITO RUEHC/SECSTATE WASHDC IMMEDIATE 5741INFO RUEHZL/EUROPEAN POLITICAL COLLECTIVERUEHEE/ARAB LEAGUE COLLECTIVERUCPDOC/DEPT OF COMMERCE WASHINGTON DCRUEATRS/DEPT OF TREASURY WASHINGTON DCRHMFISS/CDR USAFRICOM STUTTGART GERHEHAAA/NSC WASHINGTON DCRUEAIIA/CIA WASHDCRUEHTRO/AMEMBASSY TRIPOLI 6295

**Tags:** CVIS,PREL,ECON,EFIN,ECIN,EINV,EIND,ETRD,ETTC,LY

C O N F I D E N T I A L SECTION 01 OF 02 TRIPOLI 000079 SIPDIS STATE FOR NEA/MAG, COMMERCE FOR NATE MASON E.O. 12958: DECL: 1/26/2020 TAGS: CVIS, PREL, ECON, EFIN, ECIN, EINV, EIND, ETRD, ETTC, LY SUBJECT: TECHNOLOGY TO TOURISM: HEAD OF INVESTMENT AUTHORITY DISCUSSES OPPORTUNITIES FOR U.S. BUSINESS IN LIBYA CLASSIFIED BY: Gene A. Cretz, Ambassador, U.S. Embassy Tripoli, Department of State. REASON: 1.4 (b), (d)

1.(C) Summary. During a January 20 meeting with the Ambassador, Mohamed Layas, the Head of the Libyan Investment Authority (LIA, Libya's sovereign wealth fund), welcomed the February 20-23 Department of Commerce-led Trade Mission and highlighted ways that U.S. businesses could thrive in Libya, particularly in the tourism and health services sectors. The Ambassador underlined the need for the Libyan government to eliminate the "visa freeze" for official Americans and to improve the visa process for other Americans, including allowing American tourists to enter Libya. Layas asserted that the LIA has USD 32 billion in liquidity, and noted that several American banks are each managing USD 300-500 million of the LIA's funds. End Summary.

HOW U.S. BUSINESS CAN THRIVE IN LIBYA: TECHNOLOGY TO TOURISM                **111**

2.(C) During a January 20 meeting in his prime office-space overlooking the Mediterranean Sea, Layas discussed with the Ambassador (accompanied by the FCS officer and P/E chief) the many ways in which U.S. businesses could thrive in Libya, through investment, trade, and joint ventures. He welcomed the February 20-23 Department of Commerce Trade Mission and offered his thoughts on how to make the program a success -- "The best thing to do is to meet the right people here. You should have 2-3 ministers address the whole group." He explained that the LIA was very interested in attracting more U.S. business to Libya and believed the U.S. could play a "major role" in Libya's development. During a recent visit to Washington, Layas met with a number of American company representatives, as well as the Export-Import Bank (EXIM), to educate them on opportunities to invest in the "unique [Libyan] market," which according to him, unfortunately includes bureaucratic "red tape and corruption." Some of the advantages that Layas saw the U.S. having over European competitors for contracts in Libya are the weakness of the dollar compared to the Euro, as well as U.S. access to more advanced technology. Layas believes U.S. companies can expand on their success in Libya's hydrocarbon market by competing for contracts in the electricity market, health services, and tourism.

3.(C) Layas was particularly interested in importation of advanced U.S. medical technology, outlining plans to create a large medical center in Tripoli. He sees opportunities for U.S. firms to enter into joint ventures with Libyan companies to develop such plans. Additionally, he noted that the LIA plans to manage a large tourism development plan, which will involve USD 1 billion projects in Western Libya, Eastern Libya, the Green Mountains, and potentially another city (most likely Tripoli). Layas believes more than half of Libya's projected USD 136 billion development plan budget has been committed in contracts, but implied that some companies may back out of those contracts, as they were "reconsidering the conditions." Layas asked the Ambassador to pass on the message that Libya was still open to development by U.S. companies and that Libya wants to establish "lasting relationships" with major U.S. firms.

IMPROVING BILATERAL RELATIONS THROUGH VISAS

4.(C) The Ambassador attested to the interest of Americans -- businesspeople, government officials, and tourists -- in coming to Libya, but underlined the obstacles that Americans face when trying to obtain visas. The current "visa freeze" for official Americans was only the latest in a number of difficulties that Americans faced. The Ambassador highlighted the imbalance in our governments' approaches to the relationship -- whereas the Embassy provided full consular services and had issued over 3,000 visas to Libyans since opening in April 2009, U.S. tourists still could not visit Libya. The situation is affecting Embassy operations, including planning for the Trade Mission, and needs to be addressed. Layas sympathetically commented that he had also faced problems recently in trying to obtain visa approvals for a number of American businessmen that had been invited to visit Libya for business discussions.

LIA'S INVESTMENTS: WEATHERING THE STORM

5.(C) The Ambassador stressed the U.S. commitment to the bilateral relationship, including in trade and investment. He inquired about the state of the Libyan economy and the LIA's wealth in particular, given fallen oil prices and the recent world economic crisis. Layas informed the Ambassador that Libya had "weathered the storm" of the economic crisis. He noted that the LIA operated with "high liquidity," and therefore was not concerned about the volatility of the oil market. "We have USD TRIPOLI 00000079 002 OF 002 32 billion in liquidity," he stated, "mostly in bank deposits that will give us good long-term returns." He explained that several American banks are each managing USD 300-500 million of LIA's funds, and opined that the LIA was entangled in a legal disagreement with Lehman Brother's due to a major investment that was "mismanaged." He said that the LIA has an office in London and preferred doing business there rather than in the United States, due to the "ease of doing business" in the UK and relatively "uncomplicated tax system." He noted that the LIA's primary investments are in London, in banking and residential and commercial real estate.

TECHNOLOGY TO TOURISM: HEAD OF INVESTMENT AUTHORITY DISCUSSES OPPORTUNI...   Page 3 of 3

6.(C) Layas denied press reports that the LIA had invested USD 100 million with the infamous Allen Stanford. He said that he had personally written a letter to the "Financial Times" disputing the information, explaining that Stanford had approached the LIA in the middle of his crisis, offering a 7-8% share in his investment scheme, but Layas had refused. Layas also mentioned having been previously approached by Bernard Madoff about an investment opportunity, "but we did not accept." On the contrary, LIA's recent purchase of the Canadian Verenex oil company -- after much controversy over the manner in which it was purchased and share price -- was considered by Layas a "good deal." LIA plans to operate Verenex jointly with the Libyan Investment and Development Corporation (LIDCO).

7.(C) Comment: The LIA controls at least seven subsidiary organizations, and a fund that holds USD 32 billion in liquid assets. The fact that Layas weathered his own storm -- LIA's controversial, reported entanglement with Allen Stanford -- in a regime that has proven to be unforgiving in the face of embarrassment, is surprising, and indicative of his strong ties to powerful protectors within the Libyan regime. End comment. CRETZ

© Copyright of Telegraph Media Group Limited 2011

**113**

# KVT-7

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CR. NO. H-09-342 |
| | § | (Hon. David Hittner) |
| ROBERT ALLEN STANFORD, | § | |
| LAURA PENDERGEST-HOLT | § | |
| GILBERTO LOPEZ, | § | |
| MARK KUHRT and | § | |
| LEROY KING | § | |

## ALLEN STANFORD'S MOTION TO RECONSIDER
## AND/OR REOPEN THE COURT'S DETENTION ORDER

COMES NOW ROBERT ALLEN STANFORD, DEFENDANT, and respectfully requests reconsideration and/or reopening of the Court's June 30, 2009 Detention Order as provided in 18 U.S.C. §3142(f)(2), stating as follows:

### PRELIMINARY STATEMENT

**The Government has misrepresented important material facts to this Court.** The Court's Order mandating the pre-trial detention of Allen Stanford relies on numerous misrepresentations made by the Government throughout the course of the June 25, 2009 and June 29, 2009 hearings. In each instance, the Government knew or should have known it was misrepresenting material facts.

Indeed, the sworn Affidavits of the Receiver, Ralph Janvey, and an accountant working for the Receiver, Karyl Van Tassel, that were filed in the

1

United Kingdom *prior* to the June 25 and June 29 hearings contain statements that flatly contradict the evidence that was presented to this Court by the Government. *See* May 8, 2009 Affidavit of Ralph Steven Janvey; May 8, 2009 Affidavit of Karyl Van Tassel ¶s 11a and 16; and June 1, 2009 Affidavit of Karyl Van Tassel ¶ 27B and Exhibit KVT21, all attached as Appendix A.[1]

For example, the Court relied on the following misrepresentations of material facts:

1. *Mr. Stanford's expired Antiguan diplomatic passport was "missing."* In actuality, the Government has had the passport in its possession since seizing it in February of 2009; the prosecutors in this case were told that in the course of the June 25 hearing before Magistrate Judge Stacy, but continued to assert that the passport was missing during the June 29th hearing. The prosecutors finally admitted that the passport was in the Government's possession just days after the June 29 hearing, when it was discovered by Mr. Stanford's defense counsel that counsel for the Receiver had the passport in his office.

---

[1] In the London proceedings, the U.S. Receiver Ralph Janvey argued, and filed evidence to show, that Allen Stanford is a United States Citizen, that all of Allen Stanford's principal activities were centered in and conducted from Houston, Texas and not elsewhere, and that Allen Stanford's longstanding links to Texas went back several generations.

2

2. *Mr. Stanford siphoned approximately $100 million from the Societe Generale Swiss bank account 108731 in late 2008 and made "secret payments" from the account to "bribe" the Stanford auditor in Antigua.* Based on information and belief, the truth is that the Government knows and has known the purpose of the $100 million drawdown -- to pay down legitimate loans -- for months, and that the Government's own documents reveal the inaccurate depictions of the account.

3. *Mr. Stanford's primary residence is not in the United States and he does not have strong ties to Texas.* Despite the Government's claim, the Government knows that Mr. Stanford's primary residence was in the United States, as Mr. Janvey stated in his sworn affidavit. Moreover, the Government is aware that Mr. Stanford is a fifth generation Texan, was born, raised, and educated in Texas, and has centered his career and business operations in Houston, Texas since the early 1980s. To the extent the Government alleges that Mr. Stanford's recent rental of an apartment in Houston is "contrived," that is disingenuous. The Government knows it seized everything from Mr. Stanford, leaving him homeless, and the rental of an apartment in Houston was necessary in reestablishing a residence after being evicted by the Government.

3

**117**

4. *Over $1 billion is "missing" from the Stanford companies.* The examiner who testified before Magistrate Judge Frances Stacy contradicted prosecutor Pelletier's subsequent statement to this effect.

5. *Mr. Stanford has engaged in unusual and suspicious travel while knowing he was under investigation, and has had contacts both inside and outside the United States who would gladly help him to flee.* Since February, Mr. Stanford has traveled only between Houston and the Washington, D.C. area (to meet with his lawyers), Florida (to visit family members), and Las Vegas (to celebrate his birthday, at Andrea Stoelker's expense). His international travel before that was routine and ordinary for him, and was primarily business-related. Moreover, while Mr. Stanford has many prominent and influential friends in Government and private enterprise all over the world, all occupy responsible positions, are law-abiding, and would never harbor a fugitive.

6. *Mr. Stanford bribed Antiguan officials.* The Government has offered no proof, even through proffer, here or in Antigua, to support this misrepresentation.

The denial of bail in reliance on the Government's misstatements of fact and spurious evidence undermines the purpose of the Bail Reform Act (18 U.S.C. §§3141-3150). In passing Act, Congress clearly indicated its favor for non-

4

**118**

detention.  *See, e.g. United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992).  As was the case before passage of the statute, the Bail Reform Act mandates that doubts regarding the propriety of release be resolved in the favor of the Defendant. *See Byrd*; *see also Herzog v. United States*, 75 S.Ct. 349, 351 (1955) (bail is "basic to our system of law" and any doubts about whether it should be granted or denied must be resolved in the favor of defendant).  In the face of this clear Congressional purpose the Government has relied on false statements to meet its burden.  The Court's reliance on the Government's misrepresentations makes it clear that Mr. Stanford's detention is unlawful and in violation of the Bail Reform Act.  As such, the Bail Reform Act mandates this Court's Order be reconsidered and/or reopened.

Mr. Stanford also respectfully objects to this Court's application of the relevant law.  In addition to assigning undue weight to the severity of the potential sentence, which is not supported by case law, the Court failed to reflect particularized findings that no condition or combination of conditions could ensure Mr. Stanford's appearance.  These errors of law justify reconsideration of the underlying Order.

## FACTS AND ARGUMENT

**I.   The Court's Findings Rely on the Government's Misrepresentations**

**119**

### A.   The Government Has Made Numerous Misrepresentations Regarding Mr. Stanford's Antiguan Passport.

#### 1.   The Government Failed to Inform the Court that It Knew the 'Unaccounted For' Passport Was in the Possession of the Receiver.

Although the Government has been in possession of Mr. Stanford's expired Antiguan diplomatic passport for months, the Government misrepresented to this Court that the passport was missing. The Government's misrepresentation led this Court to make findings detrimental to Mr. Stanford.  *See* Order ¶15 ("The whereabouts of the second, allegedly expired, Antiguan passport is unknown."); ¶14 n. 3 ("it is unclear from the testimony or counsel argument whether Stanford also possesses a diplomatic passport issued by Antigua. The Court notes these *inconsistencies* in Stanford's statements regarding the Antiguan passports.")

The truth is that at least since February 17, when agents of the Government working with the Receiver seized Mr. Stanford's buildings, airplane hangars, apartments, books and records, even his clothing and family pictures, the Government has had possession of the "missing Antiguan diplomatic passport."[2] Mr. Stanford has long maintained that the expired passport had been seized along with his other possessions.

---

[2] Defendant requests that the Court demand all reports, emails, memoranda, or any other writings showing how the Government came into possession of the red passport that the prosecution falsely asserted it knew nothing about in hearings before this and the Magistrate's Court.

In a fortuitous conversation with Richard Roper of the Thompson Knight law firm (one of two law firms representing the Receiver) just days after the June 29 hearing before this Court, the undersigned confirmed Mr. Stanford's belief that the Receiver was in possession of the "unaccounted for" and expired Antiguan diplomatic passport, and had been for quite some time.   Shortly thereafter, the Government filed a "Notice Regarding Expired Antiguan Passport" which states, *inter alia*:

> Counsel for the Receiver informed the United States that during a July 1st conference call between counsel for the Receiver and counsel for Stanford concerning another issue, one of Stanford's attorneys raised the possibility that an expired Antiguan passport was in a briefcase at Stanford's Sugar Land airport hangar.  A Dallas attorney working for the Receiver who was on the call responded that he has had an expired Antiguan passport of Stanford's in his office.

*See* Notice, attached as Appendix B.  The passport was subsequently taken into possession by the FBI.

The circumstances under which Mr. Roper came into possession of the expired Passport have not been satisfactorily explained, but on information and belief, the prosecutors were aware that the Government was in possession of this passport and misrepresented their knowledge, both to the Magistrate Court and to this Court.  Even if the Government claims it did not actually know the Receiver possessed Stanford's expired Antiguan diplomatic passport, because of the close working relationship between the Receiver and the DOJ, the knowledge should be

7

**121**

imputed to the Government[3].  *See Avila v. Quarterman*, 560 F.3d 299, 308 (5th Cir.

2009) (knowledge held by third-party imputed to prosecutors when third party

effectively acts as part of prosecution team);  *United States v. Stewart*, 433 F.3d

273, 298-99 (2d Cir. 2006) (relationship between Government and third-party

gives rise to imputed knowledge when evidence shows third-party's involvement

with investigation or prosecution of Government's case); *United States v. Antone*,

603 F.2d 566, 570 (5th Cir. 1979) (relationship between Government and third-

party gives rise to imputed knowledge when parties' efforts are marked by spirit of

cooperation and when third-party's agents are important witnesses in the federal

prosecution).    The  fact  that  immediately  following  the  Receiver's  counsel's

disclosure to Mr. Stanford's counsel that he possessed Stanford's expired Antiguan

diplomatic passport, the Receiver's counsel chose to contact the *Government*,

supports the notion that the Receiver and the prosecutors have been working in

close concert.

The  Government's  lack  of  candor  regarding  the  expired  passport  is

egregious.  In argument and otherwise, the Government repeatedly claimed no

---

[3] The Government's failure to disclose known information raises concerns about
the lengthy and voluminous discovery process that lies ahead; the Government
must disclose all *Brady* material known to the SEC, the Receiver, and FTI—the
forensic examination firm employed by the Receiver—even if such information is
not within the Government prosecutors' actual knowledge.  *See Avila*, 560 F.3d at
307 (citing *Antone*, 603 F.2d at 569).

8

knowledge of the whereabouts of Mr. Stanford's expired Antiguan diplomatic passport, despite the fact that the passport had been in the possession of the Receiver for months.  For example, on June 25, 2009 the following exchange took place between Mr. Stanford, Magistrate Judge Frances Stacy, and Assistant United States Attorney Paul Pelletier:

> THE DEFENDANT:     Your Honor, I had my Antiguan passport—the Department of Justice and I think someone also from the SEC—they mentioned they found it.  It was in personal belongings that I had at the [Sugar Land] hangar.  It actually had expired[4].  (6/25/09, p. 211, l. 23-25).
>
> &ast; &ast; &ast;
>
> THE COURT:     Your expired passport has been seized.
> THE DEFENDANT:     Yes, ma'am. . . (6/25/09, p. 212, l. 14-15).
>
> &ast; &ast; &ast;
>
> THE COURT:     Yeah, I'd like that to be surrendered to the clerk of the Court.
> THE DEFENDANT:     Yes, ma'am.
> THE COURT [to Mr. Pelletier]:     You have the expired one?
> MR. PELLETIER:     No.
> THE COURT:     Okay.
> MR. PELLETIER:     I don't know where this is coming from.
> THE COURT:     All right.
> THE DEFENDANT:     Well, that's what I was told out of Washington.  That's what—
> MR. PELLETIER:     I don't know who he's talking to out of Washington. (6/25/09, p.213, l. 4-13).

After this exchange, in which the Government expressed surprise at the notion that Mr. Stanford's expired passport had been seized, the Government did

---

[4] Mr. Stanford's representation to the Court was truthful; the red Antiguan passport expired in 2005.  See Appendix C.

not choose to pursue or look into the possibility that the Receiver had the passport (which, arguably, the Government already knew) but instead chose to perpetuate the misrepresentation several days later, at the June 29 hearing:

> THE COURT:     Are you saying "one of the two [Antiguan passports]"?  Are there two?  We have one that was turned in today.  Are there two?
> MR. COSTA:     That's what Mr. Stanford told Judge Stacy on Thursday.
> THE COURT:     You're holding up the transcript.
> MR. COSTA:     Yes, your Honor.  And I'm going to quote in a second from it— (6/29/09, p. 88, l. 7-14).
>                          * * *
> MR. COSTA:     So at the end of the day this whole Antiguan passport issue, what do we know?  There's two of them.  One's still unaccounted for. (6/29/09, p.92, l. 19-21).

At the end of the day, the fact remains that the Government knew the location of Mr. Stanford's expired Antiguan passport, yet failed to timely correct its materially false representation prior to the conclusion of the June 29 hearing as required by *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  This is grounds for reversal of this Court's Detention Order.

### 2.     The Government Also Misrepresented Mr. Stanford's Communications with Pretrial Services Regarding His Other Antiguan Passport.

The Government also misrepresented to this Court that Mr. Stanford had not disclosed to Pretrial Services that he possessed an Antiguan passport.  The Court

relied on the Government's misrepresentation.  *See* Order at ¶ 13 ("Stanford failed to disclose to Pretrial Services that he also possessed an Antiguan passport.").

Following his arrest, Mr. Stanford met with Pretrial Services in Virginia. Pretrial Services in Virginia specifically asked Mr. Stanford if he possessed a *United States* passport.  To that question, Mr. Stanford answered truthfully.[5] Pretrial Services never asked Mr. Stanford if he possessed any passports other than his United States Passport.  The Government's arguments and insinuations to the contrary during the June 29, 2009 hearing before this Court were misleading and prejudicial.

### 3. The Statements Mr. Stanford Made About the Discovery and Production of His Remaining Antiguan Passport Were Not Inconsistent.

In part because of the misrepresentations and confusing statements made by the Government during the June 25 and June 29 hearing, the Court ultimately concluded that Mr. Stanford's statements regarding his remaining Antiguan passport were inconsistent.  As the Court held:

At the June 25, 2009 hearing before the magistrate judge, Stanford stated he did not know where his Antiguan passport currently was

---

[5] During the June 29, 2009 hearing, Pretrial Services Officer Cynthia Moreno approached counsel for Mr. Stanford and stated in substance that the policy of Pretrial Services directs officers to only ask about United States Passports.  Ms. Moreno also confirmed that Pretrial Services in Houston did not interview Mr. Stanford.

located. At the June 29th hearing, it was made clear to the Court that Stanford indeed possessed two Antiguan passports, one of which was expired. Also at the June 29th hearing, Stanford surrendered one Antiguan passport to the Court, indicating that a friend of Stanford had retrieved the passport from Stanford's hangar apartment in Antigua in May.

*See* Order at ¶14; *see also* ¶ 14 n. 3("The Court notes these *inconsistencies* in Stanford's statements regarding the Antiguan passports.") (emphasis added). This is not so.

Mr. Stanford did not make or proffer inconsistent statements regarding the Antiguan passports. At the June 25 hearing before Magistrate Judge Stacy, Mr. Stanford notified the Court that the expired diplomatic Antiguan passport, which the Government had failed to disclose, was in the Government's actual or constructive possession:

> THE DEFENDANT:     Your honor, I had my Antiguan passport . . . it was in personal belongings I had at the [Sugar Land] hangar. It actually had expired.
>
> * * *
>
> . . . and [the SEC or DOJ] told me they found the passport, and they said "it was a red one, wasn't it?" when I turned it[6] in in D.C., and they said, "Yes," and they said, "Well, it's expired anyway." I said, "I know that." (6/25/09, pp. 211, l. 23 – p. 212, l. 11).

---

[6] "it" refers to the United States passport Mr. Stanford surrendered following the SEC's complaint in February, 2009. This confusing use of the impersonal pronoun "it," from context, refers first to the expired red Antiguan diplomatic passport, then to the United States passport, then again to the red Antiguan passport.

12

At the same hearing Mr. Stanford also informed Magistrate Judge Stacy of a second Antiguan passport:

> THE COURT:     Your expired passport has been seized.
> THE DEFENDANT:     Yes, ma'am. And I will—
> THE COURT:     From Antigua.  But you think you have another one in Antigua?
> THE DEFENDANT:     Yes, ma'am.
> THE COURT:     A current passport?
> THE DEFENDANT:     Well, I had one when we were flying in and out.  I never—it was just—it was kept at the hangar [in Antigua] when we had—
> THE COURT:     Okay.
> THE DEFENDANT:     —when I was flying in and out of Antigua, but I will do my best to find that one. (6/25/09, p. 212, l. 14-25).

Four days later, at the June 29 hearing, Mr. Stanford proffered through counsel a statement about the unexpired Antiguan passport:

> MR. DeGUERIN:     We tracked [the Antiguan passport] down.  A friend of Mr. Stanford's had been in Antigua in late May for his daughter's graduation from medical school and brought the passport back to Austin with him and had not yet gotten it to—either to Mr. Stanford or to us.  We have it now.  It's here." (6/29/09, p. 65, l. 17-22).

There is nothing "inconsistent" between Mr. Stanford's statements on June 25 regarding the location of his Antiguan passport, and counsel's proffered explanation on June 29 regarding the production of the Antiguan passport; Mr. Stanford was honest with Magistrate Judge Stacy when he acknowledged having a second Antiguan passport.

13

**127**

On the issue of this unexpired Antiguan passport, Mr. Stanford now proffers

the newly-available statement of Calvert Thomas[7] to resolve any remaining

ambiguity:

> My name is Calvert Thomas. I am a citizen of Antigua. My date of birth is 10th January 1968. For five years I have been employed as the Manager for Stanford Aviation in Antigua and I've known Allen Stanford for five years.
>
> Mr. Stanford often flew into Antigua and kept some personal possessions in his hangar at the airport, where I worked. For several years he has left his Antiguan passport in the hanger in care of me, which makes it easy to clear him in and out of Antigua (especially when he is in a hurry). As far as I know the Antiguan passport has only been used here in Antigua, and I understand Mr. Stanford has not been allowed to travel here since February of this year. On April 21st of this year I gave the passport and some other personal items which were delivered to me from Barbara Street to Mr. Stanford's friend David Le Boeuf so it could be delivered to Mr. Stanford's lawyers in the United States. Mr. Le Boeuf had come to Antigua to attend his daughter's graduation from medical school, and said he would take the package of personal items, including the Antiguan passport, back to the United States.

Mr. Stanford also proffers the newly-available statement of David Le Boeuf[8]:

> My name is David Le Boeuf. I am an American citizen, a resident of Austin, Texas, and a business man.
>
> * * *
>
> I have been a life long friend of Allen Stanford. I travelled to Antigua in April 2009 for my daughter's white coat ceremony at American University of Antigua Medical School. While in Antigua, I used the hangar facility that was part of Stanford Aviation. I spoke with Allen Stanford prior to my

---

[7] Attached as Appendix D.
[8] Attached as Appendix E.

14

return to the U.S. on Thursday, April 23rd, 2009. He asked if I could bring back a few of his personal effects, and I said that I would. I was given a large manila envelope from one of his employees and brought it back to Texas. When I returned home to Austin, we had planned to meet in Houston so that I could give him his personal items. As I understand it, Allen had to go to Washington, D.C. to meet with his lawyers on the S.E.C. civil case and we did not get an opportunity to talk about our meeting in Houston as planned. Not long after, Allen was arrested. I kept the envelope in my possession until Andrea Stoelker called me and asked that I make arrangements to have a person from Allen's attorney's office pick up the envelope. I was out of town on vacation, so I had my younger brother meet the person and give the items to him.

The evidence corroborates Mr. Stanford's June 25 statement to Magistrate Judge Stacy that Stanford believed, as of June 25, that his Antiguan passport may still have been in Antigua. There was no inconsistency in his testimony.

### B. The Government Has Made Numerous Misrepresentations Regarding the Societe Generale Swiss Bank Account

#### 1. The Government Made Misrepresentations to the Court Regarding The $100 Million That Were Withdrawn From The Swiss Bank Account.

Throughout the hearings, the Government misrepresented to the Court that $100 Million had "gone missing" from Mr. Stanford's Societe Generale Swiss Bank Account 108731 in late 2008. The Court relied on the Government's misrepresentation, finding that "the balance in the [Societe Generale account 108731] bank account decreased from approximately $120 million to

approximately $20 million during the last two weeks of December, 2008, about the time the SEC and other regulatory agencies began taking enforcement actions against SIBL." Order at ¶6. The Court further concluded that "the Government presented evidence that Stanford directed payments to be made from a bank account known only to himself and Davis, that $100 million was withdrawn from the bank account in late 2008 corresponding with the time frame the SEC began its inquiry into SFG . . ." Order at ¶33.

In truth, account number 108731 is one of several accounts held by SFG at Societe Generale, established over twenty years ago. In recent years the funds on deposit in that account were used as security for business loans advanced by Societe Generale. For example, funds in the account were used as collateral to secure loans for the purchase of Banco Galicia in Venezuela (re-named Stanford Bank Venezuela) for the sum of $94 million, a 14-story office building in Caracas (later sold for a $10.5 million profit, which profit was credited to the capital of Stanford Bank Venezuela), and to grow the Stanford Bank Venezuela businesses by opening fourteen branch offices. Before Societe Generale made the $95 million loan, the bank required a complete description in writing of what the funds would be used for, along with a Board of Directors resolution and an assignment of all cash and investments in account 108731. Based on information and belief, James Davis – who is "cooperating" with the Government – was fully aware of the details

16

of this loan, as well as the details surrounding the drawdown of account 108731. In December 2008, rather than "going missing," the $100 million was used to repay outstanding indebtedness to Societe Generale on the loan for the purchase of the Banco Galicia Venezuela that was secured by the funds in account 108731.

On information and belief, James Davis, the CFO who is "cooperating" with the Government and debriefing on a daily basis, has fully informed the prosecutors of the use of the "missing" $100 million relating to account 108731, and the prosecutors obscured this fact before the Court. [9]

## 2.    The Government Also Misrepresented to the Court that Mr. Stanford Used Account 108731 To Make Suspicious Payments to the Stanford Auditor in Antigua.

The Government stated to the Court that Mr. Stanford surreptitiously used the Societe Generale account to make monthly payments to CAS Hewlett, the Stanford Auditor in Antigua.  At the June 25 hearing, the Government introduced a series of exhibits, 6/25/09 Hearing Govt's Ex. 7-14, purportedly reflecting two sets of payments to CAS Hewlett: one from a Stanford Financial Group bank account, and a second payment from the Societe Generale account that was used, in Prosecutor Pelletier's words, to "pay off secret payments to the . . . Antiguan auditors of SIBL." *See* 6/25/09 Hearing Tr., pp. 60; 198 ("[I]n addition to that

---

[9] Defendant requests that the Court demand from the prosecution the reports of interviews of James Davis to confirm that the prosecution has known of this disposition of the "missing" $100 million.

$25,000 U.S. dollars, he's paid a secret payment – the auditor in Antigua – a secret payment, in addition to that, from this secret bank account in Switzerland . . . ."); 198 ("And what's the enemy of a crooked bank?  An auditor and a regulator.  But he's taken care of that.  He's bribed the regulator and he's bribed the auditor."). Paragraph 7 of this Court's findings states, *inter alia*: "In mid-2008, Stanford and [James] Davis used the [Societe Generale account 108731] Swiss bank account to make monthly payments to their outside private auditor in amounts greater than the normal payments to those auditors, which were usually made from an established SIBL account."

The truth is that the auditor, CAS Hewlett, modestly increased his fees in the ordinary course of business, and payment was both agreed to and authorized by James Davis.

### 3.    The Government Further Misrepresented to the Court that User Account 108731 was a "Secret" account.

The Government repeatedly stated that the Societe Generale account was a "secret" account unknown to anyone other than Mr. Stanford and James Davis. The Government's own documents directly contradict this statement.   In Government's Exhibit 7, attached hereto as Appendix F, the Societe Generale

18

**132**

account is referenced in an email with no less than four Stanford employees[10].  In

an email dated September 10, 2004 from Mr. Davis to Patricia Maldonado,

Treasury Manager at Stanford Financial Group, copying Mr. Stanford and Heather

Sheppard, Mr. Davis instructs Ms. Maldonado to make a transfer to the "Societe de

General (SG) to credit our 108.731 account with them."  Ms. Maldonado then

responds to the email, copying Mr. Stanford, Ms. Sheppard, Tarrie Patlan, and

Denise Groves, stating that there will be a "[f]inal credit to SFG Ltd. account at SG

108.731."  Account 108731 was <u>not</u> a secret account.

### C.   The Government Has Made Repeated Misrepresentations Regarding Mr. Stanford's Residency in the United States and His Connection with Houston, Texas.

#### 1.   The Government Repeatedly Asserted That Mr. Stanford Did Not Reside in the United States or In Houston, Texas, Despite Knowing The Opposite To Be True.

The Government stated many times during the hearings that Mr. Stanford

has "primarily resided outside the United States for the past fifteen years" and that

his renting an apartment in Houston was "contrived."  The Court relied on this

misrepresentation, finding that "Stanford has lived primarily outside of the United

---

[10] See Appendix G, Statement of Linda Wingfield confirming that Patricia Maldonado, Tarrie Patlan, and Denise Groves were employees of the Stanford Treasury Department, and that Heather Sheppard was also a Stanford employee.

States for at least the last fifteen (15) years prior to the February 2009 filing of the SEC civil proceedings against him…" Order at ¶3[11];

The Government knows this is not the case. Well before the hearing, Mr. Janvey stated in a sworn affidavit that Mr. Stanford was a resident of the United States: "Although Allen Stanford was granted Antiguan citizenship and has some businesses and a company-owned residence in Antigua . . . he remained at all times a United States citizen, with his principle residence in the United States and its territories." Affidavit of Ralph Steven Janvey, Appendix A, ¶ 56.

The truth, which the Government knows, is that Mr. Stanford has made his home in Houston, Texas at least since 1985. He and his wife own a residence in the Tanglewood area,[12] and Mr. Stanford had maintained an apartment residence in the Houston area for the last ten years at either the Sugar Land hangar or the Stanford Lofts.[13] For many years Mr. Stanford has had an active Texas driver license,[14] listing his address as 8323 Southwest Freeway, Houston, Texas.[15]

---

[11] *See also* Order at ¶41 ("It was only when it became clear that an indictment would be returned against him that he began making living arrangements in Houston. Although he claims his children are moving to Houston, that too is only due to Stanford's impending trial in Houston."); Order at ¶ 42 ("Moreover, Stanford's longterm residence is Antigua . . .")

[12] The Receiver has given notice that he plans to seize and sell this residence, thus also evicting Mrs. Stanford from her residence.

[13] On February 17 the Receiver evicted Stanford from that apartment, seizing the hangar, the apartment, the furniture, and Stanford's clothing, family photographs, and vehicles.

[14] Mr. Stanford's driver license report is attached in Appendix H.

20

Other than the Houston apartments and Mr. Stanford's marital home for years before that, his only other permanent residence for the last several years was an apartment in St. Croix, U.S. Virgin Islands.[16]   The prosecution's statement that Mr. Stanford had resided outside the United States for the last fifteen years is false. In truth, Mr. Stanford has never maintained a permanent residence outside the United States and his primary places of residence from 1985 through the present were as follows:

1985—Houston[17]
1986—Houston
1987—Houston
1988—Houston
1989—Houston
1990—Houston
1991—Houston
1992—Houston
1993—Houston
1994—Houston
1995—Houston
1996—Houston
1997—Houston
1998—Houston and Miami
1999—Houston and Miami
2000—Houston and Miami
2001—Houston and Miami
2002—Houston and Miami

---

[15] The address is Stanford's accountant's office address, where Stanford's bills and credit card statements are sent.

[16] The St. Croix apartment was also seized.

[17] Mr. Stanford, his wife Susan, and his daughter Randi moved to Houston in 1985.

21

2003—Houston and Miami
2004—Houston and Miami
2005—Houston and Miami
2006—Houston and Miami and St. Croix, U.S. Virgin Islands
2007—Houston and St. Croix, U.S. Virgin Islands
2008—Houston and St. Croix, U.S. Virgin Islands

Admittedly, Mr. Stanford had significant connections to Antigua, but that country was not where he primarily resided. Stanford Financial Group leased a home in Antigua that was used by Stanford executives and guests and their families, and occasionally by Mr. Stanford and his family when they visited Antigua before 2000. Later, Mr. Stanford stayed on his boat (likewise seized by the Government) when he visited Antigua, and did not maintain a permanent residence. Although Mr. Stanford acquired Antiguan citizenship in 1997, this was based on his substantial business development and investment in the country, not on his residency. Since 1984, Mr. Stanford has always maintained a residence in Houston, Texas, and the Government's assertion otherwise is false.[18]

The Government's notion that Mr. Stanford's renting of an apartment in Houston is "contrived" is patently false. The Government evicted Mr. Stanford from both his Houston (Sugar Land) and St. Croix apartments, leaving him without

---

[18] Under tax advice and for tax purposes, Mr. Stanford began to file his income taxes in St. Croix, U.S. Virgin Islands in 2007 after he became a part-time resident there. Before that, he always filed his income taxes in Texas.

a residence other than the apartment he has subsequently leased[19] in Houston.  The Government on February 17, 2009 made Mr. Stanford essentially homeless, and thus, leasing the apartment in Houston was necessary to reestablish his continuing Texas residence after the Government evicted him.  The Government knew this background and failed to disclose it to the Court.  Additionally, Mr. Stanford and his wife have owned a residence in Tanglewood, where Mrs. Stanford still lives and where Mr. Stanford lived until he and his wife separated.

### 2.    The Government Understated Mr. Stanford's Connections to Texas

The Government repeatedly and inaccurately represented that Mr. Stanford does not have strong ties to Texas and the United States, leading this Court to make findings detrimental to Mr. Stanford.  *See* Order at ¶ 41("Stanford's family ties to Houston are tenuous at best and of recent vintage."); ¶ 42 ("Stanford's longterm residence is Antigua and his frequent travels across the globe and to multiple foreign countries belie his contention that he has strong ties to Houston.")

The truth is that Mr. Stanford is a fifth generation Texan who has had and continues to have strong ties not only to Texas, but to the Houston community. Mr. Stanford was born in Mexia, Texas – as was his father, grandfather, great grandfather, and great great grandfather (who settled in Mexia just after the Civil

---

[19]  See Appendix I, photograph of the apartment where Stanford's Houston residence is located.

War) — and he was raised in Fort Worth, Texas. He graduated from Baylor University in Waco, Texas, as did his father. The vast majority of Allen Stanford's family members live in Texas. These family members, with their relationship to Mr. Stanford and their permanent addresses, are:

Randi Stanford (daughter)[20]
2121 Kirby Drive
Houston, Texas

Susan Stanford (wife)[21]
5479 Holly Springs Drive
Houston, Texas

Andrea Stoelker (fiancée)
4899 Montrose #1304
Houston, Texas

Reid Stanford (son)[22]
Susan Stanford (Reid's mother)
6195 Rachel Drive
Frisco, Texas

Sammie Stanford (mother)
801 Mallard Point Drive
Granbury, Texas

James and Billy Stanford (father and stepmother)
706 S. Ross Avenue
Mexia, Texas

Ross and Allena Stanford (son and daughter)[23]

---

[20] A photograph of the front of Randi Stanford's apartment building is attached as Appendix J.
[21] A photograph of the house at Holly Springs Drive is attached as Appendix K.
[22] Reid Stanford is moving to Houston to be near his father. He will finish his senior year of High School in Houston.

24

138

Louise Sage (Ross and Allena's mother)
4899 Montrose #1905
Houston, Texas

Robert Conn (uncle)
5401 Falconwood Court
Arlington, Texas

Lauren Kuehn (niece)
702 Oak Hill Drive
Mexia, Texas

Josh Kuehn (nephew)
901 Greenleaf
Mexia, Texas

Darlene Teel (sister)
901 Greenleaf
Mexia, Texas

Sandra and Jimmy Birdwell (sister and brother-in-law)
1336 Boyd
Irving, Texas

Kyle Birdwell (nephew)
932 Grand Teton
Plano, Texas

Bryan Birdwell (nephew)
6260 Granite Creek Drive
Fort Worth, Texas

---

[23] Ross and Allena Stanford, and their mother Louise Sage, have relocated to Houston from Dallas and have leased an apartment in the same apartment building as Mr. Stanford's apartment. A copy of the lease agreement is attached as Appendix L. This is not an "illusory" tie to the community, but rather, an example of how committed the Stanford family is to fighting Mr. Stanford's battle together.

Clay Conn (cousin)
3611 Westcliff Road South
Fort Worth, Texas

Chad and Sherri Conn (cousin)
7117 Heritage Oaks
Mansfield, Texas

Mr. Stanford has had a significant presence in the Houston business community since the early 1980s. In the early and mid-1980s, when Houston faced bleak economic times, Mr. Stanford was one of the handful of people who continued to invest in Houston real estate. During this period Allen Stanford acquired numerous multi-family properties that were facing (or in) foreclosure or bankruptcy, or were being sold by financially stressed developers. Allen Stanford's belief in (and affinity for) Houston motivated him to invest while others left. In 1988-89 (post-bust), Mr. Stanford built the first high-end townhouse community, "Stanford Oaks, in Housont."[24] Mr. Stanford, his wife Susan, and daughter Randi lived in a residence at Stanford Oaks for several years after the project was developed. Other significant real estate projects developed by Mr. Stanford in Houston include the Stanford Lofts in downtown Houston, and Le Vissionage,[25] a luxury townhome development inside The Loop.

---

[24] See Appendix M, photograph of Stanford Oaks.
[25] See Appendix N, photographs of Stanford Lofts and Le Vissionage.

26

**140**

Mr. Stanford also established the world headquarters for the Stanford businesses in Houston, and Houston was where the Stanford global expansion began.   For over 25 years, Allen Stanford maintained his personal office in Houston.   Houston remained the Stanford head office until 2007.   At the time of the SEC's action, the Houston office had the largest presence of any of the Stanford offices around the world.   At that time the Stanford offices consisted of a company-owned 4-story building at 5050 Westheimer and 10 leased floors at 5051 Westheimer;   Stanford also had a contract to purchase the 20-story 5051 building, along with two sister buildings across the street, for $150 million.[26]

Not only does Mr. Stanford have significant family, residential, and business ties to Houston, he and SFG have substantial ties to the philanthropic community. Mr. Stanford now proffers the statement of Linda Wingfield[27], who states *inter alia*:

> I have known Allen Stanford for eleven (11) years.   Since I have known Allen Stanford, he has always maintained a residence in either Houston, Texas or Sugar Land, Texas.
>
> * * *
>
> I was the Director of the Global Expense Review Department for the Stanford Group of Companies for the past three years.   In that capacity, I was aware of all financial contributions made by Stanford that were in

---

[26] See Appendix O, photographs of the Stanford office buildings in Houston, which included over 260,000 square feet of functioning office space.
[27] See Appendix G.

amounts of US$5,000 or greater.  I considered the Stanford organization to have a strong philanthropic presence in the Houston community."

"For calendar year 2008, I have knowledge of the items budgeted for contributions to the Houston community.  Listed below are the organizations and charities that were scheduled for funding.  This can be confirmed by a review of the financial records of the various Stanford entities:

- BRASS—Baylor College
- Cattle Baron's Ball
- Dinner for Social Season Gala
- Dress for Success
- Education Foundation of Harris County
- Greater Houston Partnership
- Houston Hispanic Chamber of Commerce
- Houston Livestock Show and Rodeo
- Houston Magazine
- Latin Women's Initiative Luncheon
- Memorial Hermann Hospital Circle of Life Gala
- Social Book
- Texas Children's Hospital Assessment Center
- Museum of Fine Arts—Latin Exhibit
- River Center for Performing Arts
- Stanford Excellence in Arts
- Texas Children's Medical Center
- Theater Under the Stars
- University of Houston

### 3.  The Government Has Attempted To Mischaracterize the Circumstances of Mr. Stanford's Presence in Virginia At The Time of His Arrest.

The Government has mischaracterized Allen Stanford's temporary presence in Virginia.  The Court relied on the Government's misrepresentations and entered findings detrimental to Mr. Stanford.  *See* Order at ¶ 42 ("Furthermore, Stanford

was in Virginia when the indictment was returned and was taken into custody in Virginia."

Mr. Stanford now proffers the statement of Kathy Stoelker;[28] Stanford was staying at Kathy Stoelker's home[29] in Virginia when he was arrested. Kathy Stoelker states, *inter alia*:

> My name is Kathy Stoelker. I am an American citizen. I live in Fredericksburg, Virginia.
>
> I have known Allen Stanford for approximately 5 years. My daughter Andrea Stoelker is Allen's fiancée.
>
> Since February 19, 2009, Allen and Andrea have had no permanent address other than 4899 Montrose #1304 in Houston, Texas. Since that time, Allen and Andrea have stayed at my home only when Allen was in Washington, D.C. to meet with his civil attorneys. When they were not staying with me, Allen and Andrea were at their home in Houston except for one weekend when Andrea took Allen to Las Vegas for his birthday at her expense and another when Allen went to visit his children in Florida.
>
> Since February 17, 2009 when all of Allen's assets were frozen, my daughter Andrea has paid for all of their living expenses from her personal savings. Because of this, I am concerned for my daughter's financial well-being.
>
> One occasion when Allen was meeting with his civil lawyers in Washington, D.C. and he was staying at my home was on June 18, 2009, the day of his arrest. Earlier that day, we had heard from Allen's attorney Dick DeGuerin that an Indictment was about to be returned and Allen and Andrea were preparing to return to Houston so that Allen could surrender. In the afternoon, Allen went to the dry cleaner's to pick up a suit so that he would be able to surrender in his business clothing. When Allen returned to the

---

[28] See Appendix P.

[29] See Appendix Q, photographs of Kathy Stolker's home and the basement room where Allen Stanford stayed when he visited.

house, agents surrounded the house, but they did not make any attempts to arrest Allen. Allen went downstairs to the basement where he was staying and changed clothes to prepare to surrender to the agents. The agents came to the door as Allen was coming up the stairs to surrender. He went into the agents' custody without any problems.

My home in Fredericksburg is near several international airports and train stations.

### D.     The Government Made the Erroneous Assertion That Over $1 Billion is "Missing" From the Stanford Companies

During the Hearings, the Government stated that more than $1 Billion was "missing" from the Stanford Companies. However, the examiner who testified before Magistrate Judge Frances Stacy contradicted prosecutor Pelletier's statement to this effect. Nevertheless, the Court relied on the Government's factual misrepresentations to Mr. Stanford's detriment. *See* Order at ¶ 33 (" . . . over $1 billion in SFG funds are still yet to be accounted for by the Receiver").

The Government misrepresented the evidence to the Magistrate Court and this Court. The following colloquy reflects the true lack of evidence that any "unaccounted-for" funds are actually "missing":

[During the undersigned's cross-examination of the Government's witness]

MR. DeGUERIN:     You're not saying that the $1.1 billion went to Mr. Stanford, are you?

MR. FERGUSON:     No.

MR. DeGUERIN:     You're not saying that it went to—that Mr. Stanford took the $1.1 billion at any one time and put it someplace else, are you?

MR. FERGUSON:   No.

MR. DeGUERIN:   You're not saying that the $1.1 billion that you have not yet accounted for is not—you can account for it; you just haven't accounted for it yet?

MR. FERGUSON:   Correct. (6/25/09, pp. 83, l. 20 – p. 84, l. 5).

\* \* \*

MR. DeGUERIN:   Where did the money go?

MR. FERGUSON:   As I sit here right now, I can't tell you.

MR. DeGUERIN:   You have no evidence that the money went to Mr. Stanford, do you?

MR. FERGUSON:   I don't know right now where the money went. (6/25/09, p. 97, l. 6-10).

\* \* \*

MR. DeGUERIN:   And I'm going to use the bugaboo word that nobody's yet used in this courtroom today.  This isn't a Ponzi scheme, is it?

MR. FERGUSON:   I haven't formulated an opinion on that.

MR. DeGUERIN:   That would be pretty easy to see given the depth of examination that you've done so far, understanding all your limitations, it would be pretty easy to see if this was just new money coming in being paid to pay people that were already investors.  But that's not what was going on here, was it?

MR. FERGUSON:   I can't tell you one way or the other on that yet.

MR. DeGUERIN:   You cannot say that that was what was going on, can you?

MR. FERGUSON:   I can't tell you that one way or the other as we sit here right now with the records we've identified so far and reviewed.  (6/25/09, pp. 121, l. 20 – p. 122, l. 7).

If the Government had had any evidence that over $1 billion was actually "missing" from the Stanford companies as the Government wants the Court to believe, the Government could easily have proffered such evidence at the hearings;

31

but the Government did not do so.  Instead, the Government misrepresented the

evidence by equating FTI's and the Government's confusion and unawareness, to

affirmative evidence of "missing" funds.  Likewise, if the Government had had any

evidence to substantiate its wild claim of a Ponzi scheme, the Government could

easily have proffered such evidence at the hearings; but the Government made no

attempt to do so.[30]

> **E.    The Government Mischaracterized Mr. Stanford's International
> Travel and Connections, Both Here and Abroad, to Portray Him As A
> Flight Risk.**

The Government has construed Mr. Stanford's legitimate contacts and

business travel as support for the Government's false assertion that Mr. Stanford is

a "flight risk."

> **1.     The Government Has Exaggerated the Scope of Mr.
> Stanford's International and Domestic Travel.**

As noted by the Court, Mr. Stanford's United States Passport reveals his

travel to more than thirty countries on five continents since 2005." *See* Order ¶ 10.

However, the Government misrepresented the data in Stanford's flight logs to

exaggerate the scope of Mr. Stanford's international contacts-- the Government

presented the logs to the Court without distinguishing between those occasions

---

[30] Moreover, for the last 20 years, the IRS has constantly audited Stanford's
companies.  None of those constant audits turned up any Ponzi scheme or anything
else, other than disputes about taxes owed.

when Mr. Stanford actually visited a country, those occasions when his airplane merely made a refueling stop on an international flight, and those occasions when the plane traveled without Mr. Stanford on board.

To clarify, Mr. Stanford now proffers the statement of former SFG pilot Craig Wollmershauser[31], who was employed by the Stanford Financial Group (SFG) as a pilot and has known Mr. Stanford for over six years.   Mr. Wollmershauser states, *inter alia*:

> My name is Craig Wollmershauser . . .For years, I was employed by the Stanford Financial Group ("SFG") as a pilot and have known and flown Allen Stanford for approximately 6 ½ years.
>
> * * *
>
> It is common on international flights to make interim stops to refuel, depending on the range of the aircraft and the destination.   During a refueling stop, I do not consider it uncommon for immigration authorities to stamp passengers' passports without the passengers ever getting off the plane as each country has its own way of handling technical stopovers with passengers on board.

Mr. Stanford also proffers the statement of Andrea Stoelker[32], Stanford's fiancée and an employee of the Stanford companies, who travelled with Stanford extensively from 2001 through 2009.   Andrea Stoelker states, *inter alia*:

> "I reviewed Government Exhibit 14A from the bond hearing on June 25, 2009.   I believe this exhibit is inaccurate and misleading.   The exhibit purports to set out Allen's travel in and out of countries from 2004 to February 17, 2009 by combining entries from Allen's passport with a flight

---

[31] See Appendix R.
[32] See Appendix S.

logbook for the plane. What is misleading is that the flight logbook does NOT indicate passengers, only where the plane travelled. The Global Express was not only for Allen's use—other Stanford employees and people with whom Stanford had business used the plane. Therefore, there are some entries where the Government says Allen was some place and it was merely that the plane was there. The plane travelled to certain destinations for maintenance. Allen would not have been with the plane when it travelled for maintenance."

"Some of the countries mentioned in Exhibit 14A were merely countries where we stopped for refueling such as Sweden and Brazil. To my knowledge, Allen never visited those countries."

"The Government claims Allen visited Malaysia, Singapore, and Thailand. These stamps related to our 2-day train trip vacation in 2007."

### 2.   Mr. Stanford's Travel Since The SEC Investigation Began Is Normal And Routine, Contrary to Government Assertions.

Just as they exaggerated his international travel, the Government attempted to misconstrue Mr. Stanford's recent travel as "suspicious." The Court relied on that wrongful assertion. *See* Order ¶ 8 ("In late 2008, the SEC issued a subpoena for Stanford to testify before the commission regarding the SEC investigation into SFG. On January 26, 2009, Stanford traveled from St. Croix, U.S. Virgin Islands to Tripoli, Libya and then on to Zurich, Switzerland, where he stayed until January 29, 2009. Stanford's pilot testified this was an unusually lengthy stay compared to Stanford's previous trips to Switzerland.")

Since February, when Mr. Stanford was indicted, Mr. Stanford has traveled only between Houston and the Washington, D.C. area (to meet with his lawyers),

Florida (to visit family members) and Las Vegas (to celebrate his birthday, at Andrea Stoelker's expense). His travel before that was routine and ordinary for him, and was primarily business-related.

To the extent the Government tries to insinuate that there is a connection between the SEC subpoena and Mr. Stanford's trips to Libya and Switzerland, they are wrong. Mr. Stanford's travel to Libya and Switzerland was ordinary and business-related. The trip had been planned for several months and Mr. Stanford had received approval from the U.S. State Department for the Libyan portion of the trip. Furthermore, contrary to the Government's false claim, Stanford did *not* spend three full days in Zurich and the time he did spend in Zurich was not unusually lengthy compared to Stanford's previous trips to Switzerland.

According to Mr. Wollmershauser, the SFG pilot:[33]

I have been a corporate pilot, flying internationally, for 24 years. It is not unusual for individuals to schedule corporate jets at the last minute. One of the reasons for businesses to utilize private jets is for that kind of flexibility of travel. As to the best of my knowledge, Mr. Stanford never scheduled a flight at the last minute solely to conceal his whereabouts, but rather, was simply his way of life.
Between November 2002 and February 18, 2009, I frequently flew Mr. Stanford internationally.

\* \* \*

From January 25 through 29, 2009, I was assigned as a captain to take Mr. Stanford from St. Croix, U.S. Virgin Islands to Tripoli, Libya, then to

---

[33] Attached as Appendix R.

Zurich, Switzerland, and then to Miami, Florida.   My co-pilot was Jay Smith.

My electronic flight log for this trip is as follows:

| January 25 | 0336 UTC,  Depart St. Croix, USVI. |
| | 1212 UTC,  Arrive Tripoli, Libya. |
| January 26 | 1611 UTC, Depart Tripoli, Libya. |
| | 1812 UTC, Arrive Zurich, Switzerland. |
| January 29 | 0601 UTC,  Depart Zurich, Switzerland. |
| | 1602 UTC,  Arrive Miami, USA. |

Mr. Stanford had planned to leave Zurich the evening of January 28, 2009, however, he and the other passenger arrived at the airport too late and we were unable to leave due to airport curfew closure.  When he was informed that we were unable to leave, Mr. Stanford asked how early he could leave the next morning.  We then left at the earliest departure time available the next day, which was 6:00 a.m.

I have flown Mr. Stanford to Zurich more than several times and do not believe this was an unusually lengthy stay compared to Stanford's previous trips to Switzerland.

Mr. Stanford also proffers the previously-cited statement of Andrea Stoelker to further demonstrate the Government's misrepresentation:

In January 2009, I accompanied Allen on a trip to Tripoli, Libya.

The trip was planned months earlier in October 2008 when Allen met in Washington with Dr. Abdulhafid Zlitni who is the Secretary of Planning for the Libyan government.  The meeting was arranged and attended by Peter Siragna, a financial advisor for Stanford Group Suisse.  Dr. Zlitni was primarily interested in developing Libya's tourism industry, but also was considering investing a larger portion of the country's cash reserves with Stanford.  At the time of the meeting, Libya had invested approximately $500M with Stanford.  Dr. Zlitni invited Allen to come to Libya.  We scheduled the trip for December 2008 and the trip was cancelled due to the Libyan government's scheduling conflicts.

We scheduled another meeting in January 2009 and the Libyan government again cancelled at the last minute.

We finally made the trip to Tripoli later in January. Upon arrival on January 25, Allen, Peter Siragna, and I had dinner with Mr. Sherif. We then returned to the hotel for the evening. The next day, Allen had meetings with Dr. Zlitni briefly, but primarily with Mr. Sherif who was Peter Siragna's main contact in Libya and also responsible for the account with Stanford. Allen also met with Hussin Elhadi who was the Head of the Deputy Chairman Office for the Libya Africa Investment Portfolio. Mr. Sherif shared Dr. Zlitni's desire to develop the tourism industry in Libya, but was also very interested in partnering with Stanford in Caribbean initiatives like the Islands Club. Allen also met with Mohamed Layas who is the CEO of the Libyan Investment Authority and with Musbah AlkARI who is a manager of the Central Bank of Libya. Later in the day, Allen and I toured Tripoli, visiting museums and cultural sites.

After one day of meetings in Tripoli, Allen, Peter Siragna, and I flew back to Zurich on January 26, 2009. Allen and I spent one day of recuperating in our hotel. On January 28, 2009, Allen attended meetings all day at the Stanford Group Suisse office. I was present when he dictated 3 letters to Deb Meacham, the chief marketing officer for Stanford Group Suisse. The letters all related to the meetings Allen had had with the government officials while in Tripoli. We attempted to depart Zurich on the evening of the 28th, but the airport had closed. We therefore, departed at 6:00 a.m. the next morning to return to Miami.

The Government's insinuations that there was something improper about Mr. Stanford's January trip to Libya and Switzerland are false.

37

**151**

### 3.     The Government's Portrayal of Mr. Stanford's Previous Travel Habits Is Both Irrelevant and Inaccurate.

The Government has no basis to claim that Mr. Stanford's previous international travel shows a flight risk.[34]   The fact that the Stanford companies once maintained private aircraft is not relevant to Mr. Stanford's risk of flight because, as the Government is well aware, the Receiver has sold or is attempting to sell all the aircraft;[35] meaning Mr. Stanford no longer has access to any of the aircraft.

Likewise, the Government's contention that Mr. Stanford tried to hide his whereabouts while traveling is likewise disingenuous and misleading.  Every flight required the filing of a flight plan with the Federal Aviation Administration, and Mr. Stanford's pilots kept detailed logs.  The Government's implication that Mr. Stanford's travel is "suspicious" because he sometimes traveled at the last minute is groundless.  According to former Stanford pilot Craig Wollmershauser, "it is not unusual for individuals to schedule corporate jets at the last minute."[36]

---

[34]   *See* Order at ¶ 9 ("Moreover, Stanford engaged in routine, almost continual, international travel on the fleet of six private jets and one helicopter belonging to SFG and its related companies.  Testimony indicates these flights were often scheduled at the last minute and steps were taken to conceal Stanford's whereabouts.")

[35] The Stanford companies never owned a helicopter as the Government claims.

[36] See Appendix R.

38

The Government further misrepresents the meaning of evidence that Mr. Stanford's passport "shows multiple occasions in which there is an exit stamp for Antigua but no corresponding entry stamp, or an entry stamp with no corresponding exit stamp."   Order at ¶ 12.   Over the years, Mr. Stanford maintained three passports:   a United States passport, an Antiguan diplomatic passport,[37] and a regular Antiguan passport.   The record contains proffered evidence that Mr. Stanford's regular Antiguan passport was kept in the hangar in Antigua, under the supervision of Calvert Thomas.   Upon Stanford's arrival in Antigua, Calvert Thomas would typically produce Stanford's passport to the Antiguan officials.   However, if Calvert Thomas was not present at the time of Stanford's arrival or departure, that passport would not be stamped.   The Government has proffered no evidence to justify an inference that the manner in which Antiguan authorities stamped Mr. Stanford's passports bears any relation to whether Stanford is a flight risk.

---

[37] Mr. Stanford was issued a diplomatic passport upon being appointed as an economic advisor to Antigua's prior government.   The appointed position called upon Stanford to help Antigua and Barbuda grow its economy by encouraging new business development in the country.

39

### 4.    Mr. Stanford's International and Domestic Contacts Would Not Help Him Flee.

The Government offered evidence to show that Mr. Stanford has contacts outside the United States, but offered no evidence to support that an inference that any of those contacts would ever help Mr. Stanford flee.  Nevertheless, the Court relied on the Government's claim.  *See* Order at ¶ 16 ("It is clear that Stanford has numerous international business contacts.")

Indeed, Mr. Stanford has many prominent and influential friends in Government and private enterprise all over the world.  However, all of those contacts occupy responsible positions, are law-abiding, and would never harbor a fugitive.  Of the friends Mr. Stanford has in Government or in prominent positions of private business, the very positions they hold are strong proof that none would harbor or aid a fugitive.[38]

The Government also mischaracterizes the nature of the financial support Mr. Stanford has received from his contacts.  The Government argued that Mr. Stanford's friends and contacts have shown willingness to provide him with financial support, and specifically focused on payments made by Scott Jones.  The Court relied on the Government's argument, holding that "Stanford's

---

[38] Individuals mentioned at the June 29 hearing include Hon. Michael Oxley, Hon. Robert Wexler, Former Houston Mayor Lee Brown, Adolph Olgi, and Former Secretary of State Madeline Albright, among others.

**154**

acquaintances have shown a willingness to provide him with financial support. For example, an individual Stanford had not met until April 2009 paid $36,000 for one year's rent for an apartment in Houston for Stanford to live in pending his trial." *See* Order at ¶ 17.

In truth, none of Mr. Stanford's acquaintances have shown any inclination to provide financial support to encourage Stanford to flee. The evidence shows that Scott Jones gave Mr. Stanford $36,000 for the explicit purpose of helping Stanford *re-establish* (after the Government had evicted Stanford from his apartment at the Sugar Land hangar) his residence in Houston. Additionally, Mr. Stanford has had no access to his funds, necessitating borrowing money from friends and family in order to live from day to day[39]. This does not make Mr. Stanford a flight risk.

### F. The Government Misrepresented That Mr. Stanford Bribed Antiguan Officials.

Without any supporting evidence, even through proffer, the Government has made the bold and incorrect assertion that Mr. Stanford bribed Antiguan regulators. This Court adopted the allegation into its findings. *See* Order ¶ 18 ("Furthermore, the indictment alleges Stanford bribed Leroy King, Commission of the Antiguan

---

[39] See Appendices S (statement of Andrea Stoelker) and P (statement of Kathy Stoelker).

Financial Services Regulatory Commission, to prevent detection of the alleged fraud.")

As of July 5, 2009, Antiguan counsel for Leroy King has informed counsel for Mr. Stanford that the Government still has produced no evidence against King in Antigua. According to Leroy King's Antiguan counsel, King is subject to a "provisional warrant" that restrains King in his liberty for thirty to sixty days; if no evidence is produced during that time period, the provisional warrant will expire. The Government's unsubstantiated allegation should not provide the basis for findings against Mr. Stanford.

## II.     Stanford Respectfully Objects to the Court's Application of Law.

### A.     *The Severity of the Potential Sentence Cannot Weigh Heavily in Favor of Detention.*

In its Order, the Court makes the following finding: "The severity of the potential sentence weighs heavily in favor of detention. *See United States v. Almasri*, Crim. A. No. H-07-155, 2007 WL 2964780, at *1 (S.D. Tex. Oct. 10, 2001) (finding severity of potential ten-year sentences weighed in favor of detention)." *See* Order at ¶ 29. The Court makes this mixed finding of law and fact in relation to the nature and circumstances of the offenses charged.

42

However, the balance of case law does not support a legal conclusion that the severity of the potential sentence can weigh heavily in favor of detention.[40] The United States Supreme Court implicitly discounted the weight assignable to this factor in *Truong Dinh Hung v. United States*, 439 U.S. 1326 (1978).   In *Troung Dinh Hung*, the District Court revoked the defendant's bail following the defendant's conviction of espionage-related charges carrying a potential for two life sentences plus additional terms of imprisonment totaling 35 years.[41]   *Id.* at 1327, n.4.

The District Court in *Troung Dinh Hung* relied on three reasons for revoking the defendant's bail: (1) the substantial evidence of guilt; (2) the seriousness of the crimes and <u>the length of the potential sentences</u>; and (3) <u>the risk of flight, given the severity of the potential sentences</u> and the fact that applicant was not an American citizen.   *Id.* at 1327 (emphasis added).   The defendant was a Vietnamese citizen who had not established a permanent residence in the United States.   If he had fled

---

[40] Furthermore, the cited authority, *United States v. Almasri*, is a district court opinion that cites no Fifth Circuit or other authority for the proposition stated.

[41] In the interim between the Court of Appeals' rejection of Truong Dinh Hung's appeal and the Supreme Court's consideration of the issue, the District Court sentenced Truong Dinh Hung to 15 years imprisonment. However, the Supreme Court's opinion rested on the factual record considered by the District Court and the Court of Appeals (relying on the fact of Truong Dinh Hung's prospective two life sentences plus 35 years), as Truong Dinh Hung did not amend the record at the District Court or the Court of Appeals to reflect his 15-year sentence by way of a motion for reconsideration of bail revocation. *Id.* at 1327, n.4.

43

to Vietnam, the United States would have had no means of procuring his return[42].

*Id.* at 1327.   Considering these facts[43], the Supreme Court overruled the District Court, stating:

> "But if these considerations suggest opportunities for flight, they hardly establish any inclination on the part of applicant to flee.  And other evidence supports the inference that he is not so inclined."

*Id.* at 1329.   The Supreme Court held that the record before it did not provide the District Court with sufficient basis to revoke Truong Dinh Hung's bail.  *Id.* at 1330.

Because the District Court's order revoking bail was explicit in its assignment of heavy weight to the severity of Truong Dinh Hung's potential sentence, the Supreme Court's analysis and decision must be read to reflect the relative unimportance of that factor, even in the midst of other conflicting evidence bearing on the risk of flight.  This reading of the *Truong Dinh Hung* decision is even more compelling in the instant case, because Mr. Stanford, unlike Truong Dinh Hung who had already been convicted, is entitled to the constitutional presumption of innocence.

---

[42] Importantly, Truong Dinh Hung's parents still resided in Vietnam and the evidence showed that the lack of a passport or other travel documents would present no great obstacle to his flight.

[43] The Court considered other facts as well, including Truong Dinh Hung's ties to The United States and the fact that he had raised a colorable issue on appeal.

44

Any fair consideration of the severity of the potential sentence will naturally depend on the weight of the evidence upon which the sentence would be based; the product value of these two considerations must ultimately be discounted to accommodate the presumption of innocence. Because the severity of the potential sentence is premised upon a hypothetical conviction, the factor can never occupy an elevated position. *See United States v. Gebro*, 948 F.2d 1118 (9th Cir. 1991) (the weight of the evidence is the least important of the factors); *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) (Bail Reform Act neither requires nor permits a pretrial determination of guilt); *see also United States v. Barnett*, 986 F. Supp. 385, 393 (W.D. La. 1997) (favorably citing *Gebro* and *Motamedi* for the propositions stated).

Therefore, Mr. Stanford respectfully argues that Paragraph 29 improperly assigns heavy weight to the severity of the potential sentence.[44]

**B.**    ***The Evidence Does Not Justify Detention***

As detailed above, the Court entered a number of findings after relying on the Government's affirmative misrepresentations. *See, e.g.* Order at ¶ 44 ("Taken together, Stanford's longstanding ties to a country other than the United States—

---

[44] Should the Court undertake a re-weighing of the § 3142 (e) factors supporting release, Mr. Stanford respectfully requests that the Court revisit the weight due Stanford's several attempts, through counsel, to voluntarily surrender upon indictment. *See* Appendix T, letters from the undersigned to the Government requesting and offering voluntary surrender.

45

**159**

Antigua and Barbuda, his primary residence for the past fifteen years, his access to an international network and financial resources, his familiarity with global travel, and the severity of the punishment he may be subjected to if convicted of the charges alleged in the indictment against him compel the Court's determination that Stanford poses a significant risk to flee the Court's jurisdiction prior to trial. *See Cisneros,* 328 F.3d at 618; *Minns,* 863 F.Supp. at 364; *Almasri,* 2007 WL 2964780, at *2.") The presence of the many misrepresentation presented by the Government casts a pall on the underpinnings of the Government's Order.

The Bail Reform Act (18 U.S.C. §§ 3141-3150) clearly favors non-detention. *United States v. Byrd,* 969 F.2d 106, 109 (5th Cir. 1992). As such, like the jurisprudence that preceded it, the Bail Reform Act mandates that doubts regarding the propriety of release be resolved in favor of the Defendant. *See Byrd; see also Herzog v. United States,* 75 S.Ct. 349, 351, 99 L.Ed. 1299 (1955) (bail is "basic to our system of law" and any doubts about whether it should be granted or denied must be resolved in favor of defendant). The Government's misrepresentations cannot support Mr. Stanford's continued detention. Any remaining doubts must be resolved in favor of Mr. Stanford's release.

C.   *The Court's Detention Order Does Not Fulfill The Requirements of 18 U.S.C. § 3142 Because the Order Does Not Reflect Particularized Findings That No Condition or Combination of Conditions Could Ensure Mr. Stanford's Appearance.*

Furthermore, the Government provided no evidence, as it must do under 18 U.S.C. §1342, either in the form of testimony or proffer, that prospective conditions such as home confinement and electronic GPS monitoring (in combination with other conditions) would not be effective in ensuring Stanford's appearance.

As a result, the Court's Detention Order does not satisfy the elements of the Bail Reform Act, because the Order does not make particularized findings that no condition or combination of conditions would reasonably assure Mr. Stanford's appearance as required.  In fact, conditions exist that <u>will</u> reasonably assure Mr. Stanford's appearance as required.

## CONCLUSION

Once the Government's misrepresentations are corrected, the Court's application of the law to the evidence will compel the conclusion that a condition or combination of conditions will reasonably assure Mr. Stanford's appearance as required.  For the reasons stated above, Mr. Stanford respectfully requests a reconsideration and/or reopening of the Court's June 30, 2009 Detention Order.

Respectfully submitted,

By: /S/ _____

Dick DeGuerin
DEGUERIN & DICKSON
The Republic Building
1018 Preston Avenue
Seventh Floor
Houston, TX 77002
Tel: (713) 223-5959
Fax (713) 223-9231

*Attorneys for Defendant,*
*ROBERT ALLEN STANFORD*

## CERTIFICATE OF CONFERENCE

I have attempted to confer with Gregg Costa, attorney for the Government, concerning the filing of this motion and as of the time of filing I have not been able to reach Mr. Costa.

/S/

_____

Dick DeGuerin

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of **Allen Stanford's Motion To Reconsider And/Or Reopen The Court's Detention Order** has been filed via the ECF System on July 7, 2009.

/S/

_____

Dick DeGuerin

# APPENDIX R

My name is Craig Wollmershauser. I am a citizen of the United States, my date of birth is 6-15-58. For years, I was employed by the Stanford Financial Group ("SFG") as a pilot and have known and flown Allen Stanford for approximately 6 ½ years. SFG had a fleet of 6 private jets. SFG did not own a helicopter. Allen Stanford primarily used only one of the planes, the Global Express. The other planes were used primarily by SFG for SFG business.

I have been a corporate pilot, flying internationally, for 24 years. It is not unusual for individuals to schedule corporate jets at the last minute. One of the reasons for businesses to utilize private jets is for that kind of flexibility of travel. As to my best knowledge, Mr. Stanford never scheduled a flight at the last minute solely to conceal his whereabouts, but rather, was simply his way of life.

Between November 2002 and February 18, 2009, I frequently flew Mr. Stanford internationally. It is common on international flights to make interim stops to refuel, depending on the range of the aircraft and the destination. During a refueling stop, I do not consider it uncommon for immigration authorities to stamp passengers' passports without the passengers ever getting off of the plane as each country has its own way of handling technical stopovers with passengers on board.

From January 25 through 29 2009, I was assigned as a captain to take Mr. Stanford from St. Croix , U.S. Virgin Islands to Tripoli, Libya, then to Zurich, Switzerland, and then to Miami, Florida. My co-pilot was Jay Smith.
My electronic flight log for this trip is as follows:
January 25      0336 UTC, Depart St. Croix, USVI.
                1212 UTC, Arrive Tripoli, Libya.

January 26      1611 UTC, Depart Tripoli, Libya.
                1812 UTC, Arrive Zurich, Switzerland.

January 29      0601 UTC, Depart Zurich, Switzerland.
                1602 UTC, Arrive Miami, USA.

Mr. Stanford had planned to leave Zurich the evening of January 28, 2009, however, he and the other passenger arrived at the airport too late and we were unable to leave due to airport curfew closure. When he was informed that we were unable to leave, Mr. Stanford asked how early he could leave the next morning. We then left at the earliest departure time available the next day which was 6:00 a.m.

I have flown Mr. Stanford to Zurich more than several times and do not believe this was an unusually lengthy stay compared to Stanford's previous trips to Switzerland.

I am making this statement of my own free will, upon the request of Mr. Stanford's lawyers. It is the truth. I have not been threatened or promised anything to make this statement.

Signed   _Cg Woll_

Date   4th, July 2009                    **164**

Witnessed

# APPENDIX S

My name is Andrea Stoelker.  I am an American citizen.  My date of birth is 5/30/78.  I reside at 4899 Montrose #1304, Houston, Texas.

I met Allen Stanford in 2000.  We started dating in October 2001.  After Allen and I began dating, I travelled with him extensively on his business trips.  We primarily flew on the Global Express airplane owned by Stanford Aviation, L.L.C.  Our plane trips were primarily business trips except for a couple of trips to the Bahamas in 2007, the Dominican Republic in 2008, and Napa California in 2008 with Allen's children.  Allen and I took one vacation to Europe in 2004 and one trip to Asia in 2007.  Allen and I also took a couple of trips to Las Vegas for vacation.

I attended both of Allen Stanford's recent bond hearings.  After the Government made the claim that Allen had visited 30 countries over the past 5 years, I referred to my U.S. Passport in order to ascertain the veracity of that statement.

I reviewed Government Exhibit 14A from the bond hearing on June 25, 2009.  I believe this exhibit is inaccurate and misleading.  The exhibit purports to set out Allen's travel in and out of countries from 2004 to February 17, 2009 by combining entries from Allen's passport with a flight logbook for the plane.  What is misleading is that the flight logbook does NOT indicate passengers, only where the plane travelled.  The Global Express was not only for Allen's use----other Stanford employees and people with whom Stanford has business used the plane.  Therefore, there are some entries where the Government says Allen was some place and it was merely that the plane was there.  The plane travelled to certain destinations for maintenance.  Allen would not have been with the plane when it travelled for maintenance.

Some of the countries mentioned in Exhibit14A were merely countries where we stopped for refueling such as Sweden and Brazil.   To my knowledge, Allen never visited those countries.

The Government claims Allen visited Malaysia, Singapore, and Thailand.  These stamps related to our 2-day train trip vacation in 2007.

Trip to Libya

In January 2009, I accompanied Allen on a trip to Tripoli, Libya.
The trip was planned months earlier in October 2008 when Allen met in Washington with Dr. Abdulhafid Zlitni who is the Secretary of Planning for the Libyan government. The meeting was arranged and attended by Peter Siragna, a financial advisor for Stanford Group Suisse. Dr. Zlitni was primarily interested in developing Libya's tourism industry, but also was considering investing a larger portion of the country's cash reserves with Stanford. At the time of the meeting, Libya had invested approximately $500M with Stanford. Dr. Zlitni invited Allen to come to Libya.  We scheduled the trip for December 2008 and that trip was cancelled due to the Libyan government's scheduling conflicts. We scheduled another meeting in January 2009 and the Libyan government again cancelled at the last minute.

**166**

We finally made the trip to Tripoli later in January. Upon arrival on January 25, Allen, Peter Siragna, and I had dinner with Mr. Sherif. We then returned to the hotel for the evening. The next day, Allen had meetings with Dr. Zlitni briefly, but primarily with Mr. Sherif who was Peter Siragna's main contact in Libya and also responsible for the account with Stanford. Allen also met with Hussin Elhadi who was the Head of the Deputy Chairman Office for the Libya Africa Investment Portfolio. Mr. Sherif shared Dr. Zlitni's desire to develop the tourism industry in Libya, but was also very interested in partnering with Stanford in Caribbean initiatives like the Islands Club. Allen also met with Mohamed Layas who is the CEO of the Libyan Investment Authority and with Musbah AlkARI who is a manager of the Central Bank of Libya. Later in the day, Allen and I toured Tripoli, visiting museums and cultural sites.

After one day of meetings in Tripoli, Allen, Peter Siragna, and I flew back to Zurich on January 26, 2009. Allen and I spent one day recuperating in our hotel. On January 28, 2009, Allen attended meetings all day at the Stanford Group Suisse office. I was present when he dictated 3 letters to Deb Meacham, the chief marketing officer for Stanford Group Suisse. The letters all related to the meetings Allen had had with the government officials while in Tripoli. We attempted to depart Zurich on the evening of the 28th, but the airport had closed. We therefore, departed at 6:00 a.m. the next morning to return to Miami.

## The last several months

I was with Allen on February 17, 2009 when the receiver froze his assets. We were in Washington, D.C. on that date as Allen was interviewing attorneys from Williams & Connelly. When we became aware of the TRO, my mother drove up from Fredericksburg, Virginia to pick us up and we returned with her to her home in Fredericksburg. We stayed there for several weeks so that we would be in driving distance to Washington, D.C. to facilitate attorney's visits. I was with Allen on February 19, 2009 when he was served by FBI agents with the civil suit. We had just returned from Washington, D.C. to get Allen's passport and had intended to immediately return to Washington, D.C. in order for him to voluntarily surrender it. He offered to surrender it directly to the FBI agent, but was told he should bring it to Washington, D.C. himself. We then returned to Fredericksburg, Virginia that evening. About two hours after we arrived in Fredricksburg, the media showed up and we stayed inside for approximately five days until they left. It was during this period that I became aware that the majority of my bank accounts were frozen as well. At this point, Allen and I were forced to rely primarily on family and friends for financial support and basic living expenses. We continue to do so to this day. Allen met with several different attorneys during the month of March. He was not able to retain an attorney due to the asset freeze. In April 2009, we obtained a lease on an apartment in Houston since our apartments in Houston and St. Croix were seized and because we knew that Allen was going to be indicted in Houston. We have traveled several times in the months since the asset freeze from Houston to Washington, D.C., but only for meetings with attorneys. We have stayed at my mother's

167

home during those trips because her home is near Washington, D.C. and because we did not want to spend our limited assets on hotels.

Andrea Stoelker

07/05/09
Date

# KVT-8

From: Siragna, Peter
Sent: Wednesday, January 21, 2009 2:02 PM
To: Stanford, Allen
Subject: RE: Update on Libya!

Importance: High

Good Morning, before I can pass on the respective reference numbers (I shall receive them shortly), I can give you the contact details at the Libyan Embassy. Your office should ask for Mr. Alawjali he is the Charge D'Affair in D.C. and say that you are talking on behalf of Mr. Mokthar Ganas.

Our host is Mr. Abdulfatah A. Sharif - Deputy Chairman & MD of the Libyan Africa Investment Portfolio, Tripoli, on behalf of Dr. Abdulhafid M. Zlitni - Chairman of the Libyan Investment Authority and Minister for Planning.

Our accommodation is arranged, Executive Suite for you at The Corinthia Bab Africa Hotel, P.O. Box 82874, Souk Al Thulatha Al Gadim, Tripoli - Libya.

According to Jeffrey Butcher he is coordinating accommodation for your flight crew! Transport from & to Airport and during our stay is organized.

As I understand from Jack, there is a potential possibility, that you would return from this trip to Zurich too, in order to attend the World Economic Forum in Davos? Should this be the case, could I join you on the flight back to Zurich, to avoid extra costs and optimize travel journey, as there are no more direct flights between the two countries, since the outbreak of "the mini crisis"! Furthermore, as you originally planned to attend the EMEA Regional Update Meeting in ZH on Friday, we should have plenty of time at hand to review latest developments etc., may I ask you in this respect when you plan to arrive in ZH?
Rgds.
p.

---

From: Stanford, Allen
Sent: Tuesday, January 20, 2009 6:35 PM
To: Siragna, Peter
Subject: Re: Update on Libya!

Already done RAS

----- Original Message -----
From: Siragna, Peter
To: Stanford, Allen
Sent: Tue Jan 20 05:42:09 2009
Subject: Update on Libya!

Allen, I do expect to receive later today your Visa reference numbers, in order to collect the Visa's from that moment onwards at the Libyan Embassy in D.C.! Please also remember to "organize" in time your Arabic translation too, this service might also be offered via the Libyan Embassy! p.

**170**

From: Siragna, Peter
Sent: Monday, February 09, 2009 1:40 PM
To: Stanford, Allen
Subject: Libya

Importance: High

Allen, spoke to Abdulfatah Sharif this morning after his return from Dubai and their
position is, that they awaiting our next step of actions in respect to the
propositions we made at our visit/letters! It was also mentioned, that they would
prefer to deal with one issue after the other, rather than us to "flock in" with
everybody at the same time, i.e. maybe first with Capital Markets (distressed
assets); followed by clean technology; the Green Mountains project (real estate
development)! What do you think/suggest?

As here-to-fore, I continue to pursue/push all "avenues" in respect to SIBL! Dr.
Zlitni and Sharif will be in Rome later this week for 2 days, other than that, no
fix travel agenda was mentioned! p.

_____

From: Stanford, Allen
Sent: Wednesday, February 04, 2009 9:24 AM
To: Siragna, Peter
Subject:

Peter what is the status of our Libya friends and their doing more business with
Stanford. RAS

**171**

Federal Register

Vol. 76, No. 41

Wednesday, March 2, 2011

# Presidential Documents

Title 3—

The President

Executive Order 13566 of February 25, 2011

## Blocking Property and Prohibiting Certain Transactions Related to Libya

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), and section 301 of title 3, United States Code,

I, BARACK OBAMA, President of the United States of America, find that Colonel Muammar Qadhafi, his government, and close associates have taken extreme measures against the people of Libya, including by using weapons of war, mercenaries, and wanton violence against unarmed civilians. I further find that there is a serious risk that Libyan state assets will be misappropriated by Qadhafi, members of his government, members of his family, or his close associates if those assets are not protected. The foregoing circumstances, the prolonged attacks, and the increased numbers of Libyans seeking refuge in other countries from the attacks, have caused a deterioration in the security of Libya and pose a serious risk to its stability, thereby constituting an unusual and extraordinary threat to the national security and foreign policy of the United States, and I hereby declare a national emergency to deal with that threat.

I hereby order:

**Section 1.** All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any overseas branch, of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in:

(a) the persons listed in the Annex to this order; and

(b) any person determined by the Secretary of the Treasury, in consultation with the Secretary of State:

(i) to be a senior official of the Government of Libya;

(ii) to be a child of Colonel Muammar Qadhafi;

(iii) to be responsible for or complicit in, or responsible for ordering, controlling, or otherwise directing, or to have participated in, the commission of human rights abuses related to political repression in Libya;

(iv) to have materially assisted, sponsored, or provided financial, material, logistical, or technical support for, or goods or services in support of the activities described in subsection (b)(iii) of this section or any person whose property and interests in property are blocked pursuant to this order;

(v) to be owned or controlled by, or to have acted or purported to act for or on behalf of, any person whose property and interests in property are blocked pursuant to this order; or

(vi) to be a spouse or dependent child of any person whose property and interests in property are blocked pursuant to this order.

**Sec. 2.** All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including

any overseas branch, of the Government of Libya, its agencies, instrumentalities, and controlled entities, and the Central Bank of Libya, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in.

**Sec. 3.** For those persons whose property and interests in property are blocked pursuant to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render those measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in this order, there need be no prior notice of a listing or determination made pursuant to section 1 of this order.

**Sec. 4.** I hereby determine that, to the extent section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) may apply, the making of donations of the type of articles specified in such section by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to sections 1 and 2 of this order would seriously impair my ability to deal with the national emergency declared in this order, and I hereby prohibit such donations as provided by sections 1 and 2 of this order.

**Sec. 5.** The prohibitions in sections 1 and 2 of this order include but are not limited to:

(a) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order; and

(b) the receipt of any contribution or provision of funds, goods, or services from any such person.

**Sec. 6.** The prohibitions in sections 1 and 2 of this order apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order.

**Sec. 7.** (a) Any transaction by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

**Sec. 8.** Nothing in this order shall prohibit transactions for the conduct of the official business of the Federal Government by employees, grantees, or contractors thereof.

**Sec. 9.** For the purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization; and

(c) the term "United States person" means any United States citizen or national, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States.

**Sec. 10.** The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government consistent with applicable law. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

173

**Sec. 11.** The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to determine that circumstances no longer warrant the blocking of the property and interests in property of a person listed in the Annex to this order, and to take necessary action to give effect to that determination.

**Sec. 12.** The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to submit the recurring and final reports to the Congress on the national emergency declared in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703(c)).

**Sec. 13.** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**Sec. 14.** This order is effective at 8:00 p.m. eastern standard time on February 25, 2011.

THE WHITE HOUSE,
*February 25, 2011.*

Billing code 3195–W9–P

**174**

**11318**    **Federal Register**/Vol. 76, No. 41/Wednesday, March 2, 2011/Presidential Documents

## ANNEX

<u>Individuals</u>

1. Ayesha QADHAFI [Lieutenant General in the Libyan Army, born circa 1976 or 1977]

2. Khamis QADHAFI [born 1980]

3. Muammar QADHAFI [Head of State of Libya, born 1942]

4. Mutassim QADHAFI [National Security Advisor and Lieutenant Colonel in the Libyan Army, born circa 1975]

5. Saif Al-Islam QADHAFI [born June 5, 1972]

[FR Doc. 2011–4753
Filed 3–1–11; 8:45 am]
Billing code 4811–33–C