IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:11-CV-1177-N |
| | § | |
| LIBYAN INVESTMENT AUTHORITY | § | |
| & LIBYAN FOREIGN INVESTMENT | § | |
| COMPANY, | § | |
| | § | |
| Defendants. | § | |

### TEMPORARY RESTRAINING ORDER

This Order addresses the Receiver's application for a temporary restraining order ("TRO") [2], motion for authorization of substitute service [6], and motion for leave to file under seal [9]. For the reasons that follow, the Court grants the Receiver's motions and enjoins, as set forth in more detail below, Defendants the Libyan Investment Authority and the Libyan Foreign Investment Company (collectively, the "Libyan Defendants") and any person or financial institution from taking any act to dissipate funds in the Libyan Defendants' accounts held at Citibank, N.A., until the earlier of: (1) fourteen (14) days from the date of this Order, or (2) the Court rules on the Receiver's motion for a preliminary injunction.

### I. ORIGINS OF THE RECEIVER'S REQUESTS

This case presents another episode related to the Securities and Exchange Commission's (the "SEC") ongoing securities fraud action against R. Allen Stanford, his

ORDER – PAGE 1

associates, and various entities under Stanford's control (the "Stanford Defendants"). As part of that litigation, this Court "assume[d] exclusive jurisdiction and t[ook] possession of the" "Receivership Assets" and "Receivership Records" (collectively, the "Receivership Estate"). *See* Second Am. Order Appointing Receiver, July 19, 2010 [1130] (the "Receivership Order"), *in SEC v. Stanford Int'l Bank*, Civil Action No. 3:09-CV-0298-N (N.D. Tex. filed Feb. 17, 2009). The Court appointed Ralph S. Janvey to serve as Receiver of the Receivership Estate and vested him with "the full power of an equity receiver under common law as well as such powers as are enumerated" in the Receivership Order. *Id.* at 3.

Among these enumerated powers, the Court "authorized [the Receiver] to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." *Id.* at 4. Additionally, the Court "specifically directed and authorized [the Receiver] to . . . [c]ollect, marshal, and take custody, control, and possession of all the funds, accounts, mail, and other assets of, or in the possession or under the control of, the Receivership Estate, or assets traceable to assets owned or controlled by the Receivership Estate, wherever situated," *id.*, and to file in this Court "such actions or proceedings to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." *Id.* at 5.

Pursuant to those powers, the Receiver has filed this fraudulent transfer suit to recover approximately $55 million in alleged proceeds of Stanford International Bank, Ltd., certificates of deposit once held by the Libyan Defendants. The Receiver now seeks a

temporary restraining order and preliminary injunction enjoining the Libyan Defendants from dissipating those funds, which are currently held in accounts at Citibank, N.A. The Libyan Defendants' U.S.-based assets generally, including those at issue in this action, have been frozen by an executive order entered by President Obama in response to the currently ongoing internecine conflict within the nation of Libya. *See* Exec. Order No. 13,566, 76 Fed. Reg. 11,315 (Feb. 25, 2011).

## II. THE RECEIVER QUALIFIES FOR A TRO

The Receiver shows that he is entitled to temporary relief pending consideration of his preliminary injunction application.

### *A. Temporary Restraining Order Standard*

"The prerequisites for preliminary injunctive relief are long-established in this circuit." *Libertarian Party of Tex. v. Fainter*, 741 F.2d 728, 729 (5th Cir. 1984). A plaintiff seeking preliminary injunctive relief must demonstrate (1) a substantial threat that it will suffer irreparable injury; (2) a substantial likelihood of success on the merits; (3) that the threatened injury to plaintiff outweighs any threatened harm to the defendant; and (4) granting injunctive relief will not disserve the public interest. *Id.* The party seeking preliminary injunctive relief carries the burden of persuasion on all four requirements. *Bluefield Water Assoc., Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009). In the TRO context, the necessary persuasiveness of a plaintiff's likelihood-of-success showing "varies, and often may depend on the facts in a particular case." 11A WRIGHT, MILLER, & KANE, FEDERAL PRACTICE AND PROCEDURE § 2951 (2d ed. 1995). A TRO movant must

show "at least a reasonable probability of prevailing on the merits." *Id.* "[S]ome courts have stated that when grave harm is threatened, the applicant need show only that its claims provide a fair ground for litigation." *Id.* (collecting cases). The decision to grant preliminary injunctive relief lies within the court's sound discretion. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

### B. Potential Dissipation of the Libyan Defendants' Assets Poses a Substantial Threat of Irreparable Injury to the Receivership Estate

The Receiver demonstrates a substantial threat of irreparable injury. Executive Order 13,566 may be modified or rescinded at any time. Should that occur, the Receiver alleges that, absent interim relief from the Court, there is a substantial risk that the Libyan Defendants will dissipate the assets subject to this action before the Court can rule on the Receiver's application for a preliminary injunction. The Receiver provides substantial evidence that some portion of the Libyan Defendants' already-frozen funds are the fruits of a series of fraudulent transfers from the Stanford Defendants' Ponzi scheme, and that the Libyan Defendants showed some awareness of the Stanford enterprises' illicit nature. The Court finds that this history, coupled with the ongoing Libyan civil war, creates a reasonable inference that the Libyan Defendants will dissipate the assets as soon as they are unfrozen. And, although the possibility of monetary damages normally militates against granting preliminary injunctive relief, the Receiver shows a real possibility exists that the Libyan Defendants will transfer or dissipate the funds at issue in such a way as to make them virtually unrecoverable. Monetary damages therefore provide an inadequate remedy in this case. Given that the targeted funds represent a large portion of the putative Receivership

Estate, the Court finds that the possibility of dissipation presents grave harm to the Receivership Estate, and thus the Stanford Defendants' creditors.

### *C. The Receiver Is Likely to Succeed on His Fraudulent Transfer Claim*

The Receiver demonstrates a likelihood of success on the merits of his claim under the Texas Uniform Fraudulent Transfer Act ("TUFTA"). *See* TEX. BUS. & COM. CODE §§ 24.001-.013. Because of the grave harm threatened, the Court requires the Receiver to establish only that his claims provide "a fair ground for litigation." Determination of likelihood of success requires recourse to substantive law. *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir.1990) (citing *Miss. Power & Light*, 760 F.2d at 622). The Receiver's TRO application and supporting evidence present a prima facie case for the Libyan Defendants' liability under TUFTA. Among other things, the Receiver presents strong evidence that the Stanford Defendants operated a Ponzi scheme. If true, as a matter of law any transfers from the Ponzi scheme are presumed to have been made with actual intent to defraud. *See Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (citations omitted). Furthermore, the Receiver provides reason to believe that the Libyan Defendants had knowledge of the Stanford scheme's fraudulent nature, suggesting that they will be unable to establish an affirmative defense of good faith. Accordingly, the Court finds that the Receiver has carried his burden for TRO purposes. The Court will revisit the likelihood-of-success issue when it rules on the Receiver's preliminary injunction application. At that time, the Court will also consider the Libyan Defendants' rebuttal evidence and affirmative defenses, including any

potential defenses under the Foreign Sovereign Immunities Act (the "Act"). *See* 28 U.S.C. §§ 1330, 1602-1611.

### D. The Threat Posed to the Receivership Estate Outweighs any Potential Harm to the Libyan Defendants

The potential harm to the Receiver and Receivership Estate absent an interim TRO outweighs the any potential harm to the Libyan Defendants. Entering a TRO effectively extends the three month-old, Presidentially-authorized freeze of the Libyan Defendants' assets by, at most, an additional twenty-eight days. That *de minimis* harm is further mitigated by the fact that the Libyan Defendants' accounts will continue to accrue interest and earn investment returns during the TRO's effective period. The Receiver and the defrauded investors whose interests he represents, however, stand to lose nearly $55 million should Executive Order 13,556 expire and the Libyan Defendants transfer their assets to points unknown. The balance of harms, then, weighs strongly in the Receiver's favor.

### E. A TRO Serves the Public Interest

Finally, a TRO will not disserve the public interest. In fact, the opposite is true. The Receiver seeks to enjoin the removal of frozen funds and has offered substantial evidence that those funds are fraudulently transferred assets properly belonging to innocent Stanford creditors. If the funds are dissipated they may be transferred out of the Receiver's reach forever. To risk dissipation of one of the few assets potentially available to the Stanford Defendants' fraud victims before resolution of this case upon the merits will substantially disserve the public interest.

### III. THE COURT ENJOINS THE LIBYAN DEFENDANTS

The Court therefore orders that:

1. The Receiver must file with the Court an undertaking with surety, or cash in lieu of a bond, in the sum of $10,000 for payment of such costs and damages as may be incurred or suffered by any party who may be found to be wrongfully restrained or enjoined, such security to be approved by the Clerk of the Court.[1] This TRO shall not become active until the Clerk certifies that the Receiver has provided such security.

2. Defendants the Libyan Investment Authority and the Libyan Foreign Investment Company (collectively, the "Libyan Defendants") together with their agents, officers, directors, servants, employees, assigns, and all persons who are in active concert or participation with them who receive actual notice of this Order, including any financial institution, broker-dealer, investment advisor, private equity fund, or investment banking firm, are hereby enjoined from doing any act or thing whatsoever to remove, transfer, assign, pledge, mortgage, or otherwise dispose or dissipate any assets or funds in the Libyan Defendants accounts held at Citibank, N.A., until the earlier of: (1) fourteen (14) days from the date of this Order, (2) the Court's ruling on the Receiver's motion for a preliminary injunction, or (3) further order of the Court.

---

[1] The Receiver asks that the Court not require him to post bond. The Court agrees that the Libyan Defendants are unlikely to suffer injury from the granting of preliminary injunctive relief. The Court, however, imposes a bond requirement in recognition that the Libyan Defendants may incur some opportunity cost should the freeze ordered by Executive Order 13,556 end and yet they be unable to access the funds frozen pursuant to this action.

3. The Receiver shall serve a copy of this TRO on all banking or financial institutions with whom the Libyan Defendants conduct business or have accounts, or may conduct business, or that may be holding any assets of the Libyan Defendants in any way. Further, the Receiver must serve a copy of this TRO upon any person or entity it believes is in a position to exercise any kind of control over the purported CD proceeds, including any kind of account that contains assets belonging to the Libyan Defendants regardless of whether such account is commingled with any other kind of asset.

4. The Court will consider the Receiver's motion for preliminary injunction at a hearing to be held on Friday, June 17, 2011, at 4:00 p.m. in Courtroom 1351. The Libyan Defendants shall file their response, if any, by Wednesday, June 15, 2011, and the Receiver shall file his reply by Thursday, June 16, 2011. At the hearing, the Libyan Defendants must show cause why the Court should not grant the Receiver's motion for a preliminary injunction.

5. This Order shall expire Monday, June 20, 2011, at 4:00 p.m. unless extended for good cause or the Libyan Defendants consent that it may be extended for a longer period.

**IV. THE COURT AUTHORIZES THE RECEIVER TO EFFECT SUBSTITUTED SERVICE**

"The Supreme Court has held that the Act largely codifies the 'restrictive' theory of sovereign immunity, under which 'immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 487 (1983)).

"Thus the Act repealed foreign immunity for 'commercial activities,' § 1605(a)(2), but preserved it for inherently sovereign or public acts." *Id.* at 151-52 (citations omitted). In line with that distinction, the Act contains two separate provisions for serving process on foreign entities: one for service "upon a foreign state or political subdivision of a foreign state," 28 U.S.C. § 1608(a), and another for service "upon an agency or instrumentality of a foreign state." 28 U.S.C. § 1608(b).

Because the Libyan Defendants are foreign entities with predominantly commercial "'core functions,'" *Magness v. Russian Federation*, 247 F.3d 609, 613 n.7 (5th Cir. 2001) (quoting *Transaero*, 30 F.3d at 151)), the Libyan Defendants constitute agencies or instrumentalities of Libya rather than the Libyan government proper. Accordingly, the Receiver may properly effect service on the Libyan Defendants via section 1608(b). Section 1608(b) provides that

> service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:
> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or
> (3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state –
> > (A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

> (B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or
> (C) as directed by order of the court consistent with the law of the place where service is to be made.

The Receiver avers that he has no special arrangement with the Libyan Defendants, and that he has been unable to locate in the United States any officer or agent of the Libyan Defendants to whom he may serve with process. The ongoing strife in Libya apparently has rendered communicating with the Libyan Defendants and other Libyan authorities via mail or courier impossible. And, the Court takes judicial notice that Libya is not a signatory to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters. Nov. 15, 1965, T.I.A.S. No. 6638, 20 U.S.T. 361. The Receiver therefore proposes to effect service via email or fax pursuant to section 1608(b)(3)(C).

The Receiver has been unable to discern the particulars of Libyan service of process law, and the Court has been unable to find any authorities on the subject. Because "'Congress was . . . concerned with substance rather than form'" in enacting section 1608(b),[2] however, the touchstone of service under section 1608(b) is whether the utilized modes of service are "reasonably calculated to give actual notice." 28 U.S.C. § 1608(b)(3). To that end, the "vast majority of the case law" on the subject holds that substantial compliance "– that is, service that gives actual notice of the suit and the consequences thereof to the proper individuals within the agency or instrumentality – is sufficient to effectuate service under section 1608(b)." *Magness*, 247 F.3d at 616-17 (citing cases from the Third,

---

[2] *Magness*, 247 F.3d at 616 (quoting *Transaero*, 30 F.3d at 154).

Sixth, Ninth, Eleventh, and D.C. Circuits). Courts have found that true even where a plaintiff effects "'technically faulty service.'" *Id.* at 617 (quoting *Transaero*, 30 F.3d at 154); *see also Straub v. A P Green, Inc.*, 38 F.3d 448, 453-54 (9th Cir. 1994) (holding that substantial compliance applies to service under section 1608(b)(3)(C) even without the presence of exigent circumstances); *Harris Corp. v. Nat'l Iranian Radio & Television*, 691 F.2d 1344, 1352 (11th Cir. 1982) (actual notice trumps failure to follow "precise[] . . . steps").

The Court finds that under the circumstances the Receiver's proposed email and fax service is reasonably calculated to give the Libyan Defendants actual notice. *Cf. Harris Corp.*, 691 F.2d 1344 (upholding service via telex); *Int'l Schs. Serv. v. Gov't of Iran*, 505 F. Supp. 178, 179 (D.N.J. 1981) (authorizing service on government-controlled Iranian corporations by telex, reasoning that "[m]odern technology, with communications satellites and other sophisticated devices, ought not to be deprived the opportunity to attempt effective service, if it can"); *New England Merch. Nat'l Bank v. Iran Power Generation and Transmission Co.*, 495 F. Supp. 73, 78-80 & n.2 (S.D.N.Y. 1980) (holding that "a substituted form of service is not precluded under the [Act]," authorizing service via telex under section 1608(b), and noting that "nothing contained in the Act restrict[s] the court's otherwise unfettered authority under Rule 4 . . . of the Federal Rules of Civil Procedure to fashion a mode of service upon those not found within the United States").[3] The Court, however,

---

[3]*See also* authorities cited in Aaron R. Chacker, *E-ffectuating Notice*, 48 VILL. L. REV. 597, 604 n.43 (2003) (cases concerning service effectuated using "new technologies"), including *Rio Props. v. Rio Int'l Interlink*, 284 F.3d 1007, 1023 (9th Cir. 2002) (authorizing service on foreign business via email under Federal Rule of Civil Procedure 4). The *New England* Court also held that "[t]he language in the [Act] requiring that the mode of service

further requires the Receiver to attempt service via mail, fax, and email on the Libyan Ambassador to the United States or his designee through the Libyan Embassy in Washington, D.C.[4]  The Court directs the Receiver to attempt service through the Embassy as an alternative method of contacting the Libyan Defendants because a foreign embassy effectively, and as a matter of law, is a foreign state within the United States.  *See, e.g.*, *Int'l Road Federation v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 250 (D.D.C. 2001) (citations omitted).  Thus, it is possible that service directed at the Libyan Embassy will find its way to the appropriate authorities in control of the Libyan Defendants.

---

fashioned by the court be 'consistent' with the law of the foreign state, does not require that service be identical to the method prescribed by the foreign state.  Rather, the language indicates that the mode of service authorized by the court should not be prohibited under the law of the foreign state." 495 F. Supp. at 78-79 (citing H.R. REP. NO. 94-1487, at 25 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6624).

     A federal court in California recently rejected a plaintiffs' use of email service on an the Grain Board of Iraq, an instrumentality of the Republic of Iraq, under section 1608(b)(3)(C).  *See Rice Corp. v. Grain Bd. of Iraq*, 582 F. Supp. 2d 1309 (E.D. Cal. 2008).  In that case, however, the plaintiff failed to present any evidence contradicting the defendants' expert testimony showing that Iraqi law prohibited service via email.  *Id.* at 1311-12.  The *Rice Corporation* Court also declined to address whether the plaintiff substantially complied with the Iraqi service statute because the plaintiff raised the issue for the first time at oral argument.  *Id.* at 1313.

     [4]The Court is aware that the Libyan Ambassador has taken a stance in opposition to the Libyan government headed by Moammar Gaddafi and that the Libyan Embassy may not be fully functional.  *See* Sheryl Gay Stolberg, *Arab Revolts Force Diplomats to Remake Lives & Careers*, N.Y. TIMES, Mar. 22, 2011, at A1.  The Ambassador, however, appears to still represent the country of Libya in some capacity from a location in Washington, D.C.  *Id.*  In serving the Libyan Ambassador, the Receiver need not comply with the formal requirements of section 1608(a); service will still be directed at an instrumentality of the Libyan government.

ORDER – PAGE 12

Although the Act draws a sharp conceptual distinction between foreign governments and their instrumentalities, in practice their boundaries often prove more fluid than formal.

### V. THE COURT ORDERS ALL MATTERS IN THIS CASE SEALED

Because the Receiver's brings claims that are urgent, sensitive, and of an *ex parte* nature, the Court grants the Receiver's motion for leave to file under seal. The Court orders that all documents, pleadings, orders, and other memoranda filed in this case remain sealed until further order of this Court.

### CONCLUSION

The Court enters a TRO on the terms set forth in this Order and grants the Receiver's motions for leave to file under seal and to effect substituted service. The TRO shall become effective upon the Receiver's filing with the Clerk of Court a bond in the amount of $10,000.

Signed June 6, 2011.

_____
David C. Godbey
United States District Judge