IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RALPH S. JANVEY, IN HIS CAPACITY §
AS COURT-APPOINTED RECEIVER §
FOR THE STANFORD §
INTERNATIONAL BANK, LTD., ET AL, §
§
     Plaintiff, §
§
v. §          Civil Action No. 3:11-CV-1177-N
§
LIBYAN INVESTMENT AUTHORITY, §
*et al.*, §
§
     Defendants. §

## ORDER

This Order addresses Defendants Libyan Investment Authority ("LIA") and Libyan

Foreign Investment Company's ("LFICO") (collectively, "Defendants") motion to dismiss

the second amended complaint [136], and Defendants' motion to strike the declaration of

James C. Spindler [151].  For the reasons that follow, the Court denies the motion to strike,

and grants in part and denies in part the motion to dismiss.[1]

### I. ORIGIN OF THE MOTIONS

This case arises out of the Securities and Exchange Commission's (the "SEC")

ongoing securities fraud action against R. Allen Stanford, his associates, and various entities

under his control (collectively, "Stanford").  As part of that litigation, this Court "assume[d]

---

[1]The Court also grants Defendants' unopposed motion for extension of time to file a
reply [146].

exclusive jurisdiction and t[ook] possession" of the "Receivership Assets" and "Receivership Records" (collectively, the "Receivership Estate"). *See* Second Am. Order Appointing Receiver, July 19, 2010 [1130] (the "Receivership Order"), *in SEC v. Stanford Int'l Bank Ltd.*, Civil Action No. 3:09-CV-0298-N (N.D. Tex. filed Feb. 17, 2009). The Court appointed Plaintiff Ralph S. Janvey (the "Receiver") to serve as receiver for the Receivership Estate and vested him with "the full power of an equity receiver under common law as well as such powers as are enumerated" in the Receivership Order. *Id.* at 3.

Among these enumerated powers, the Court "authorized [the Receiver] to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." *Id.* at 4. The Court "specifically directed and authorized [the Receiver] to . . . [c]ollect, marshal, and take custody, control, and possession of all the funds, accounts, mail, and other assets of, or in the possession or under the control of, the Receivership Estate, or assets traceable to assets owned or controlled by the Receivership Estate, wherever situated," *id.*, and to file in this Court "such actions or proceedings to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate," *id.* at 5.

The Receiver filed this action under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), TEX. BUS. & COM. CODE. ANN. §§ 24.001–24.013, in order to recover proceeds of Stanford International Bank, Ltd. ("SIB") certificates of deposit ("CDs") allegedly transferred to LIA and LFICO. The Receiver moved for a temporary restraining order

("TRO") freezing Defendants' funds held in accounts with Citibank, N.A.  The Court issued

a TRO and conducted a hearing on the Receiver's motion for preliminary injunction on

January 27, 2012.  On February 29, 2012, the Court issued an Order denying the Receiver's

motion for a preliminary injunction.  *See* Feb. 29, 2012 Order [71] (the "Preliminary

Injunction Order").  Finding that the Receiver sought to clawback funds held by LIA, not

LFICO, and that LIA had not itself invested in Stanford's scheme, *see id.* at 4–5, the Court

performed a veil-piercing analysis to determine whether LIA could be held liable for

LFICO's investments, *id.* at 9–12.  Finding that the Receiver had failed to demonstrate that

LFICO was LIA's alter ego, the Court denied the Receiver's motion for a preliminary

injunction.  The Fifth Circuit subsequently affirmed on alternate grounds.  *See Janvey v.*

*Libyan Investment Authority*, 478 F. App'x 233, 235–36 (5th Cir. 2012).[2]

Following the denial of the Receiver's motion for preliminary injunction, the Court

granted the Receiver leave to file his second amended complaint.  *See* Dec. 11, 2012 Order

[133]; Second Am. Compl. ("SAC") [134].  Defendants move to dismiss, arguing (1) the

Court lacks subject matter jurisdiction under the Foreign Sovereign Immunities Act (the

"FSIA"), 28 U.S.C. §§ 1602–1611; (2) the Court lacks personal jurisdiction over Defendants;

(3) TUFTA does not apply extraterritorially; and (4) the Receiver has failed to state a claim

for relief under TUFTA.  The Court addresses each argument in turn.

---

[2]The Fifth Circuit reasoned that a preliminary injunction would constitute an "attachment" on LIA's property, which the Foreign Sovereign Immunities Act prohibits. *See* 478 F. App'x at 236.

## II. THE FOREIGN SOVEREIGN IMMUNITIES ACT

Defendants' FSIA argument is twofold.  First, Defendants assert the Court lacks subject matter jurisdiction over both LIA and LFICO under the FSIA.  Second, Defendants argue even if LFICO is not entitled to immunity, LIA cannot be held liable for LFICO's receipt of Stanford CD proceeds.[3]  The Court disagrees with Defendants' first contention, but agrees with their second.

### A. The Rule 12(b)(1) Legal Standard

Under the Constitution, a federal court may decide only actual "Cases" or "Controversies."  U.S. CONST. art. III, § 2.  "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."  *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)).  "The FSIA provides the sole source of subject matter jurisdiction in suits against a foreign state."  *Dale v. Colagiovanni*, 443 F.3d 425, 428–29 (5th Cir. 2006) (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)).

A court deciding a Rule 12(b)(1) motion may consider matters of fact which may be in dispute.  *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).  On consideration of a Rule 12(b)(1) motion, "no presumptive truthfulness attaches to the plaintiff's allegations, and the

---

[3]The Receiver does not allege LIA directly invested in and received transfers from Stanford.

court can decide disputed issues of material fact in order to determine whether or not it has jurisdiction to hear the case. *Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004). Specifically, under the FSIA, defendants can raise "factual" challenges to jurisdiction, wherein they contest jurisdictional facts asserted by plaintiffs or raise mixed questions of law and fact. *See Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012); *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). Where, as here, a defendant mounts a factual challenge, "the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Phoenix Consulting*, 216 F.3d at 40. The court "must give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Id.* (internal quotation marks omitted). "In order to avoid burdening a sovereign that proves to be immune from suit, however, jurisdictional discovery should be carefully controlled and limited . . . ." *Id.*

### B. The FSIA Legal Standard

As mentioned, "[t]he FSIA provides the sole source of subject matter jurisdiction in suits against a foreign state." *Dale*, 443 F.3d at 428–29 (citing *Amerada Hess Shipping Corp.*, 488 U.S. at 443). "The general rule under the FSIA is that foreign states are immune from the jurisdiction of the United States Courts." *Id.* (internal quotation marks omitted).[4]

---

[4]The Receiver does not dispute that both LFICO and LIA qualify as "foreign states." *See* SAC ¶ 10.

"However, a district court can exercise subject matter jurisdiction over a foreign state if one of the statute's exceptions apply."  *Id.* (internal quotation marks omitted).

As the parties asserting immunity, Defendants bear the burden of persuasion.  *See United States v. Moats*, 961 F.2d 1198, 1205 (5th Cir. 1992).  However, once Defendants make a prima facie showing of immunity, the burden shifts to the Receiver to demonstrate that one of the exceptions to immunity applies.  *See id.*  If the Receiver can make this demonstration, then Defendants must show that the exception does not apply.  *See id.* Because the parties agree that LFICO and LIA qualify as foreign states, the Court moves to determine whether the Receiver can establish an exception applies.

The FSIA exception at issue in this case is the "commercial activity" exception.  The commercial activity exception waives immunity in three situations:

1.    The action is based upon a commercial activity carried on in the United States by the foreign state; or
2.    The action is based upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere, or
3.    The action is based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

### C. The Court's Resolution of Defendants' Factual Challenge Is Not Premature

The Receiver contends that resolution of Defendants' factual challenge under the FSIA would be premature because he has not had the opportunity to engage in sufficient jurisdictional discovery.  *See* Pl.'s Resp. Mot. Dismiss 23–24 [141].  At the time the Receiver lodged that objection, he had pending before the Court his second motion to compel

discovery [89], which addressed a number of the discovery deficiencies he complained of in his response to the motion to dismiss.  Since then, the Court has issued two orders addressing the Receiver's various discovery motions.  *See* Aug. 22, 2014 Order [174]; Jan. 22, 2015 Order [184].  Those Orders granted in part and denied in part the Receiver's motions to compel discovery based on the standards applicable to FSIA discovery, as enumerated above. *See, e.g.*, Aug. 22, 2014 Order at 6 (granting Receiver's motion to the extent his requests were supported by authority and pertinent to the jurisdictional analysis under the FSIA). Moreover, both parties have been given an opportunity to supplement their briefing based on the discovery turned over in response to the Court's orders.  The Court accordingly finds that the Receiver has had "ample opportunity" to conduct jurisdictional discovery, and the Court may proceed with Defendants' factual challenge under the FSIA.

### D. The Court Denies Defendants' Motion to Strike

Defendants move to strike the Declaration of James C. Spindler (the "Spindler Declaration"), Pl.'s App. Supp. Resp. Mot. Dismiss ("Pl.'s App") 1–11 [142], relied on by the Receiver in his response to the motion to dismiss.  Professor Spindler purports to provide an expert opinion on whether LIA's control rights over LFICO comport with best governance practices, whether it would be appropriate to disregard LFICO's separate corporate existence, and whether it would be appropriate to hold LIA vicariously liable as LFICO's principal.  *See id.* at 2.

Whether to exclude or admit expert testimony is in the discretion of the trial courts. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 141 ("We have held that abuse of discretion

is the proper standard of review of a district court's evidentiary rulings."). In general, expert opinion evidence is admissible if it is helpful to the trier of fact. FED. R. EVID. 702(a). Typically, experts may not provide legal conclusions. *See, e.g.*, *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009). Here, while certain of Spindler's representations tread the line between factual analysis and legal conclusion, the Court finds that Spindler does provide opinions that are helpful in assessing whether LIA may be held liable for LFICO's conduct. On balance, Defendants' objections go to the weight of Spindler's declaration, and the Court considers them as such.

### E. LFICO Is Subject to Jurisdiction in this Court

Under the FSIA "commercial activity" exception as discussed above, the Court conducts what is essentially a two step inquiry. The Court must determine both (1) whether LFICO engaged in commercial activity; and if so, (2) whether its commercial activity had a sufficient jurisdictional nexus to the United States. *See Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo General del Sindicato Revolucionario de Trabajadores Petroleros de Republica Mexicana*, 923 F.2d 380, 386 (5th Cir. 1991).

***1. LFICO Engaged in Commercial Activity.*** – The FSIA defines "commercial activity" in pertinent part as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). The touchstone consideration is whether the foreign state "acts, not as regulator of a market, but in the manner of a private player within it." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992). Thus, in *Weltover*, the Argentine government's issuance of government-backed bonds was held to

be a commercial activity because the bonds were "in almost all respects garden-variety debt instruments . . . ." *Id.* at 615.

Here, the Receiver's claims are based on LFICO's investment in SIB CDs from 2006 to 2007, and its receipt of proceeds from those investments. *See* SAC ¶¶ 43–49. Defendants concede that LFICO did invest in Stanford CDs. *See* Defs.' Mot. Dismiss 15. The Court concludes based on the record that LFICO did engage in "commercial activity" as defined by the FSIA. LFICO's purchase of Stanford CDs was fundamentally an investment decision meant to grow the wealth of the LFICO's holdings. It can hardly be said that LFICO acted as a regulator in purchasing the CDs of a foreign bank. Indeed, while Defendants do not concede LFICO engaged in commercial activity, they do not ardently contest the Receiver's arguments as to that point. Accordingly, the Court holds that LFICO did engage in commercial activity through its purchase and subsequent redemptions of Stanford CDs.

***2. LFICO's Commercial Activities Had a Sufficient Jurisdictional Nexus to the United States.*** – The jurisdictional nexus requirement can be satisfied in any of three ways. (1) the defendant's commercial activity was carried on in the United States by the foreign state[5]; (2) the defendant performed an act in the United States in connection with a commercial activity of the foreign state elsewhere; or (3) the defendant performed an act outside of the United States in connection with a commercial activity of the foreign state elsewhere and that act caused a direct effect in the United States. 28 U.S.C. § 1605(a)(2).

---

[5]The FSIA defines a "commercial activity carried on in the United States by a foreign state" as a "commercial activity carried on by such state and having substantial contact with the United States." 28 U.S.C. § 1603(e).

In order to make a determination as to the nexus requirement, the Court must first outline its findings as to LFICO's activities related to its Stanford investments.

Between March 2006 and August 2007, LFICO invested over $138 million in SIB CDs. Defs.' Mot. Dismiss 17, Pl.'s Resp. Mot. Dismiss 11. It is well established that SIB was an offshore bank operated out of Antigua. It is also well established that Stanford's Ponzi scheme, of which SIB was an integral part, was based in and operated out of Houston, Texas. *See Janvey v. Alguire*, 2013 WL 2451738, at *2–3 (N.D. Tex. 2013) ("[T]he majority of all the Stanford Entities' proceeds came through the sales of CDs through [SIB], and SIB maintained its principal operating account in Houston."). These facts are largely undisputed.

The parties do dispute the nature and impact of a training session provided to LFICO employees by Stanford Group Suisse ("SGS"). In 2007, LFICO sent two representatives on a tour that began in Zurich and included stops in Houston, Texas, Washington D.C., Miami, Florida, and Antigua, before ending in Zurich. One employee was a financial analyst and one was an economic analyst. Defs.' App. Supp. Mot. Dismiss 344 [138]. Although Defendants attempt to characterize the employees as "low level" and point to one's background in customer service and tourist planning, *see* Defs.' Mot. Dismiss 19, there is nothing in the record to suggest they were not wholly legitimate representatives of LFICO on official business. Indeed, the Stanford representatives viewed them this way, anticipating that a successful trip could lead to a substantial investment. *See* App. Supp. Pl.'s Mot. Summ. J. 171 [24]. When LFICO invested $150 million following the trip, SGS attributed the success to the Stanford's U.S. team's hospitality. *See id.* at 132.

Beginning in June 2008, LFICO began to express its desire to SGS that its CDs not be renewed. Although the parties generally agree about when and how this process occurred, they seem to disagree about why. Defendants, for instance, argue LFICO's desire not to renew the CDs was simply a function of needing more cash during the economic downturn. *See* Defs.' Mot. Dismiss 21. The Receiver, on the other hand, argues that the decision not to renew was based in part on knowledge or at least concern regarding Stanford's impending collapse. *See* Pl.'s Resp. Mot. Dismiss 13 (noting that LFICO's withdrawals of CDs began after an October 2008 meeting between LIA and Allen Stanford himself).

The Receiver contends the factual record supports jurisdiction under any of the three nexus clauses. The first nexus clause requires that the plaintiff's action be "based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). There must be a *material* connection between the commercial activity carried on the United States and the plaintiff's claim. *See Stena Rederi*, 923 F.2d at 386–87. Here, the only arguably commercial activity that took place in the United States was the LFICO employees' trip, which included stops in various U.S. cities for both training and tourist purposes. Assuming these constitute commercial activities, the Court finds they fail to satisfy the nexus requirement because the connection between the Receiver's claim and the training trip is not "material." While there may be some connection between the trip and LFICO's investments that took place following the trip, the Court fails to see how this renders the connection between the trip and the Receiver's claim "material."

The Court also determines that the Receiver's suit fails to satisfy the second nexus clause, which requires the plaintiff's action be based "upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." 28 U.S.C. § 1605(a)(2).  As with the first nexus clause, this clause requires a material connection between the United States action and the plaintiff's suit.  *See Can-Am Int'l, LLC v. Republic of Trinidad & Tobago*, 169 F. App'x 396, 406 (5th Cir. 2006) (citing *Stena Rederi*, 923 F.2d at 388).  Again, the Receiver's cause of action does not have a material connection to the LFICO employees' United States trip.  The Receiver has not established that the trip directly resulted in further investments with Stanford.  Here, the Receiver's case is based on LFICO's investments with SIB, not other events which may or may not have had an impact on LFICO's investments.  The Receiver has not satisfied the second nexus clause.

The Court does find, however, that the Receiver's suit satisfies the third jurisdictional nexus clause, which requires that the defendant performed an act outside of the United States in connection with a commercial activity of the foreign state elsewhere and that act caused a direct effect in the United States. 28 U.S.C. § 1605(a)(2).  Having determined that LFICO engaged in commercial activity by investing funds in SIB CDs, and that the actions and decisions associated with those investments took place outside the United States, the Court must determine only whether those investments "cause[d] a direct effect in the United States[.]" *Id.*

"[A]n effect is 'direct' if it follows 'as an immediate consequence of the defendant's activity.'" *Weltover*, 504 U.S. at 618 (alteration in original) (quoting *Weltover, Inc. v.*

*Republic of Argentina*, 941 F.2d 145, 152 (2d Cir. 1991)).   The Supreme Court has "reject[ed] the suggestion that § 1605(a)(2) contains any unexpressed requirement of 'substantiality' or 'foreseeability.'"  *Id.*  However, the effects in the United States must be more than "trivial."  *Id.*

LFICO's investment in SIB CDs had a "direct effect" in the United States.  Although SIB was based in Antigua, this Court has repeatedly recognized that the entirety of the Stanford Ponzi scheme was based and operated out of Houston, Texas.  *See, e.g.*, *Alguire*, 2013 WL 2451738, at *2–3 ("Thus, although Stanford Entities were located nationally and internationally, the Court finds that, when aggregated, those entities were headquartered in Houston, Texas.").  Thus, by doing business with SIB in Antigua, LFICO was in reality doing business with Stanford in Houston.  Money put into and taken out of SIB's coffers in Antigua was money being funneled through Stanford's Houston-based enterprise.  Thus, as an immediate consequence of LFICO's investments, the Houston-based Stanford Ponzi scheme slipped further into insolvency and received funds it needed to keep its scheme afloat.

Defendants contend that this interpretation proves too much and "would allow the Receiver to claw back CD proceeds from LFICO even if it transacted business with and received transfers from the Tripoli branch of SIB (assuming that SIB operated a branch in Libya) and never left Libya."  Defs.' Reply 21 [150].  While the Court expresses no opinion as to whether it would have FSIA jurisdiction under those proposed facts, the point of Defendants' argument is dulled by the Defendants' apparent knowledge that, at the least,

Stanford conducted significant operations in the United States and Houston. LFICO can not claim it was unaware that Stanford was connected to the United States when its employees spent a significant amount of time in the United States in anticipation of making a substantial investment. LFICO's investment in and subsequent redemption of SIB CDs was a commercial activity having a direct effect in the United States. The Court thus concludes it has subject matter jurisdiction over the Receiver's suit against LFICO.

### F. The Court Lacks Subject Matter Jurisdiction Over the Receiver's Suit Against LIA

#### 1. The Court May Apply the Rule 12(b)(1) Standard to Arguments Concerning LIA.

– The Receiver's claims against LIA are based on various theories of vicarious liability for LFICO's Stanford investments. Neither party squarely addresses the question of whether, even assuming LIA could be held vicariously liable for LFICO's actions, LIA would nevertheless remain immune under the FSIA. Defendants' arguments for dismissal of LIA go the merits of the Receiver's theories for vicarious liability. Typically, "where issues of fact are central both to subject matter jurisdiction and the claim on the merits, . . . the trial court must assume jurisdiction and proceed to the merits." *Montez*, 392 F.3d at 150. In such a situation, a trial court must address arguments directed at the merits under the more restrictive Rule 12(b)(6) or Rule 56 standards. *Id.*

An exception to this general rule exists, however, in the context of Rule 12(b)(1) motions under FSIA. *See generally Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169 (5th Cir. 1994). Citing the FSIA's grant of immunity from suit, not just from liability, the *Moran* Court upheld the trial court's resolution of intertwined merits and jurisdictional fact questions

under the Rule 12(b)(1) standard. *See id.* at 172–73; *see also Montez*, 392 F.3d at 150 ("*Moran* carved out a limited exception to the general rule requiring the application of a 12(b)(6) or summary judgment standard to resolve issues dispositive of both subject matter jurisdiction and the merits . . . ."). Because subject matter jurisdiction over the Receiver's suit against LIA depends on the validity of the Receiver's theories of vicarious liability, questions pertinent to both jurisdiction and the merits are intertwined. Pursuant to *Moran*, the Court continues to apply a Rule 12(b)(1) standard in resolving factual issues central to the Receiver's theories of vicarious liability.

The Receiver asserts three theories under which LIA might be held responsible for the alleged fraudulent transfers. First, he contends LFICO is LIA's alter ego and can be held liable under a veil-piercing theory. Second and relatedly, the Receiver argues LFICO acted as LIA's agent, and LIA can be held liable as principal. Third, the Receiver contends that LIA can be held liable under TUFTA as "the person for whose benefit the transfer was made." TEX. BUS. & COM. CODE ANN. § 24.009(b)(1). The Court finds none of these theories meritorious.

   *2. The "Law-of-the-Case" Doctrine Does Not Apply.* – Defendants briefly argue that the Court's determination of this issue is controlled by its previous denial of the Receiver's motion for a preliminary injunction. *See* Defs.' Mot. Dismiss 31; Preliminary Injunction Order. The law-of-the-case doctrine arises from courts' reluctance to reopen previous rulings in order to maintain consistency within a case. *See* 18 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE & PROCEDURE § 4478 (2d ed. 2002). As the Receiver points out,

findings and conclusions as to a request for preliminary injunction are not generaly binding as law of the case. *See* Pl.'s Resp. Mot. Dismiss 21 (citing *Meineke Discount Muffler v. Jaynes*, 999 F.2d 120, 122 n.3 (5th Cir. 1993)). As will be discussed, the Receiver has procured new evidence that was not considered on his motion for preliminary injunction. Accordingly, the Court declines to holds its previous determination constitutes the law of the case.

   **3. The Court's Factual Findings as to LIA's Relationship to LFICO.** – In denying the Receiver's motion for preliminary injunction, the Court reviewed the Receiver's presentation of (a) bank records from LIA's Citibank account that list LFICO as an "a.k.a." of LIA, (b) United Nations and United Kingdom documents stating the same, (c) the fact that Stanford operated through the same contact for both LIA and LFICO, (d) the fact that LIA owns 100% of LFICO, and (e) Libyan government documents setting out LIA's duty to manage and invest LFICO's assets and include LFICO's assets in LIA's assets. *See* Preliminary Injunction Order at 10. The Court found this evidence was outweighed by affidavits filed by Mohamed Layas, LIA's chairman, and Nagmeddin Hemali Mokhtar, LFICO's Chairman and Managing Director. *See id.* at 11. The Receiver's evidence now is largely the same, supplemented with the Spindler Declaration and an October 2008 report on sovereign wealth funds by the International Working Group on Sovereign Wealth Funds. *See* Pl.'s App. 13–71. The Court addresses each piece of novel evidence in turn.

   The Spindler Declaration purports to provide a more in-depth analysis of the Libyan government documents reviewed for the Receiver's motion for preliminary injunction. *See*

Pl.'s App. 3–4. Spindler interprets the Libyan government documents concerning the corporate governance of LIA and LFICO and concludes that LIA retains substantially greater control rights over LFICO's operations than would be considered normal or proper under American law. Given the Libyan government documents as he understands them, Spindler thus concludes that LFICO was "little more than an instrument or conduit for LIA, and it is therefore appropriate to (i) disregard LFICO's corporate identity and allow veil piercing to reach LIA, and/or (ii) hold LIA vicariously responsible for LFICO's actions and obligations as its agent." *Id.* at 10.

The Court identifies two related problems with the Spindler Declaration that diminish its weight in this analysis. First, the Spindler Declaration is only as good as the translations supporting it, and the inevitable reality of legal documents is that nuance and context are lost in translation. *See generally* Andrew N. Adler, *Translating & Interpreting Foreign Statutes*, 19 MICH. J. INT'L L. 37 (1997). Relatedly, the Receiver does not provide and Spindler thus does not rely on any evidence demonstrating how the Libyan government documents are interpreted and ultimately put into practice. The Spindler Declaration clashes with the sworn affidavits of Layas and Mokhtar, who are in a much better position to both interpret the governance documents and explain to the Court how the documents are implemented in practice. The Court continues to give substantial weight to the Layas affidavit, which stated:

> LIA and LFICO have separate boards of directors and there are no interlocks in the boards of directors of LIA and LFICO. LIA is not responsible for controlling or managing specific activities or transactions at the subsidiary level. These tasks are the responsibility of LFICO's own board of directors and management, which have independent authority to conduct LFICO's

> investment activities . . . .  LIA did not play any role in connection with LFICO's investment with [Stanford].

Aff. Mohamed Layas 2–3 [39].  The Court recognizes apparent incongruities between some of the provisions relied upon by Spindler, and Layas's affidavit.  However, absent expert testimony from someone familiar with Libyan corporate governance, the Court resolves these ambiguities in favor of those who have first-hand experience in dealing with LIA and LFICO.

The Receiver's second piece of novel evidence is a report, authored in part by Mohamed Layas, which states that "[t]he LIA funds consolidated pre-existing funds such as the Libyan Foreign Investment Company, the Libyan African Investment Porfolio, and Oilinvest Company." Pl.'s App. 58.  The Court afford this evidence little weight because the statement provides very little context as to what it means when it says funds were consolidated.  As Defendants point out, the language could easily mean that LFICO's shares were transferred to LIA, an interpretation that would be consistent with Layas's and Mokhtar's affidavits.  On balance, the Receiver has provided little evidence of weight beyond that considered on the motion for preliminary injunction.

*4. The Receiver Fails to Demonstrate that LFICO is LIA's Alter Ego.* – In Texas, piercing the corporate veil requires a showing that the owner is "using the corporate entity as a sham to perpetrate a fraud, to avoid personal liability, avoid the effect of a statute, or in a few other exceptional situations." *Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336, 340 (Tex. 1968) (quoting *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.3d 196, 202 (Tex. 1962)).  "There must be something more than mere unity of financial interest, ownership and

control for a court to treat the subsidiary as the alter ego of the parent and make the parent liable for the subsidiary's tort." *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 374 (Tex. 1984) (italics omitted) (quoting *Hanson Sw. Corp. v. Dal-Mac Constr. Co.*, 554 S.W.2d 712 (Tex. App. – San Antonio 1966, writ ref'd n.r.e.)).  Plaintiff must show that the subsidiary "is organized and operated as a mere tool or business conduit of [its parent] corporation," *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986), *superseded in part on other grounds by* TEX. BUS. CORP. ACT art 2.21 *as recognized in W. Horizontal Drilling Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 68 (5th Cir. 1994), so that "there exists such unity between [the two corporations] that [they] cease[] to be separate." *Mancorp., Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990) (citing *Castleberry*, 721 S.W.2d at 272).  Alter ego liability is appropriate where "holding only the [subsidiary] corporation liable would result in injustice." *SSP Partners v. Gladstrong Inv. (USA) Corp.*, 275 S.W.3d 444, 454 (Tex. 2008) (quoting *Castleberry*, 721 S.W.2d at 272).

Based on the above evidence and the evidence relied upon in denying the Receiver's motion for preliminary injunction, the Court again concludes the Receiver has failed to establish that LFICO is LIA's alter ego.  Affidavits from insiders Layas and Mokhtar, *see* Aff. Mohamed Layas 2–3; Aff. Nagmeddin Hemali Mokhtar 2–3 [56], tend to establish that LFICO and LIA each enjoyed a separate corporate existence.  As discussed, the Receiver's novel evidence fails to persuade the Court that the Layas and Mokhtar affidavits should not be credited as the most persuasive and well-informed interpretations of the relationship between LIA and LFICO.  As it did in denying the Receiver's motion for preliminary

injunction, the Court holds the Receiver has failed to establish LFICO operated as LIA's alter ego.

**5. *The Receiver Fails to Set Forth a Basis for Vicarious Liability Under Principles of Agency.*** – A principal may in some circumstances be held liable for the conduct of its agent. *See, e.g.*, *Southwestern Bell Tel. Co. v. Wilson*, 768 S.W.2d 755, 759 (Tex. App. – Corpus Christi 1988, writ denied). One of the hallmark requirements for imposing such liability is that the principal "had a right to control the activities of the wrongdoer."[6] *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 541 (Tex. 2003). Although the standards for alter ego liability and liability under a principal/agent theory are not identical, the Court's analysis above dictates the same result here. The evidence in the record, particularly the Layas affidavit and the Mokhtar affidavit, indicate LFICO operated independently of LIA and was not subject to LIA's control. Accordingly, the Court determines agency is not a valid basis to hold LIA liable for LFICO's actions.

**6. *TUFTA Section 24.009(b)(1) Does Not Provide an Independent Basis for Holding LIA Liable.*** – Finally, the Receiver asserts LIA may be held liable under TUFTA section 24.009(a)(1), which allows a creditor to take judgment against "the person for whose benefit the transfer was made." TEX. BUS. & COM. CODE ANN. § 24.009(b)(1). In considering this argument on the Receiver's motion for preliminary injunction, the Court concluded the

---

[6]An additional requirement for holding the principal liable for an agent's actions is that the agent had actual or apparent authority to act on behalf of the principal. *E.g.*, *Sociedad De Solaridad Social El Estillero v. J.S. McManus Produce Co.*, 964 S.W.2d 332, 333 (Tex. App. – Corpus Christi 1998, no pet.). The parties do not brief this requirement, so the Court does not address it here.

Receiver failed to present any evidence that LFICO redeemed its Stanford CDs for the benefit of LIA. Preliminary Injunction Order 5–6. The Court also expressed its doubts as to whether section 24.009(b)(1) in fact could be read to impose liability on a parent corporation absent a showing that veil piercing was also proper. *See id.* at 6–7 (citing *In re Hansen*, 341 B.R. 638, 644–46 (Bankr. N.D. Ill. 2006)). For largely the same reasons, the Court again declines to permit the Receiver to maintain his claims against LIA based on section 24.009(b)(1). The only novel piece of evidence the Receiver cites is the aforementioned Sovereign Wealth Funds Report, which the Court has already determined establishes nothing more than that LIA held LFICO's shares. And the Court's concerns as to the propriety of holding a parent liable under TUFTA absent a showing of alter ego persist. For those reasons and based on the factual record as it stands, the Court concludes section 24.009(b)(1) is not a proper basis for holding LIA liable.

Having concluded the Receiver fails to present a basis for holding LIA liable for LFICO's investments, the Court grants Defendant's motion as to LIA and dismisses the Receiver's claims against it.

### III. PERSONAL JURISDICTION

Defendants argue that even if the Court has subject matter jurisdiction under the FSIA, the Court must nevertheless engage in a due process analysis to determine whether LFICO is subject to personal jurisdiction in this Court. Although the FSIA provides for personal jurisdiction in any action over which the Court also has FSIA subject matter jurisdiction and the foreign state has been properly served, *see* 28 U.S.C. § 1330(b), courts typically still

consider whether exercising personal jurisdiction comports with due process, *see, e.g.*, *Stena Rederi*, 923 F.3d at 386 n.8 (requiring in addition to subject matter jurisdiction under the FSIA that the exercise of personal jurisdiction comport with due process). However, because the Court concludes LFICO is not entitled to the protections of due process, the Court determines LFICO is subject to personal jurisdiction in this Court.

### A. LFICO Is Not Entitled to Due Process

The parties disagree over whether, as a foreign state, LFICO is considered a "person" for the purposes of the due process clause. *See* U.S. Const. amend. V ("No person shall be . . . deprived of life, liberty, or property, without due process of law."). The Receiver primarily relies on *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005). In *TMR*, the D.C. Circuit applied the Supreme Court's decision in *First National City Bank v. Bank Para el Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611 (1983), to determine whether the foreign instrumentality before it could be considered an agent of the Ukranian state, and thus not a "person." *TMR*, 411 F.3d at 325–26. In making its determination, the court relied on its findings that Ukraine had plenary control over the instrumentality, the Ukranian president had the power to appoint and discharge the instrumentality's chairman, and the instrumentality's budget was paid for by the Ukranian government. *Id.* The court thus concluded that the instrumentality was an agent of the Ukranian state, not a "person" under the Fifth Amendment, and was accordingly not entitled to due process protections. *Id.* at 326.

In turn, Defendants rely on *First Investment Corp. of the Marshall Islands v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742 (5th Cir. 2012).  In *First Investment Corp.*, the Court conducted a *Bancec* analysis that was much the same as that employed in *TMR*, but reached a different result.  *Id.* at 752–53.  The Court noted that although the People's Republic of China ("PRC") owned 100% of the instrumentality's stock, the instrumentality's officers were not required to operate in the PRC's best interests, and the PRC was not involved in the day-to-day operations of the instrumentality.  *Id.* at 754.  Thus, *First Investment Corp.* and *TMR* are not at odds, but simply applied the same test to different facts and reached a different result.

Applying the Fifth Circuit's interpretation of *Bancec*, and considering for guidance the D.C. Circuit's decision in *TMR*, the Court concludes there is a sufficient connection between LFICO and the Libyan government such that LFICO can be considered Libya's agent.  The Fifth Circuit directs courts to "look to the ownership and management structure of the instrumentality, paying particularly close attention to whether the government is involved in day-to-day operations, as well as the extent to which the agent holds itself out to be acting on behalf of the government."  *Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*, 965 F.2d 1375, 1382 (5th Cir. 1992).  Here, LFICO operates solely in the national interest of Libya.  Decl. Albudery R. Shariha 2 [98].  LFICO possesses "special status and is treated as an organ of the Government of Libya."  *Id.*  The governing body of LFICO is comprised in large part of government representatives.  *Id.*  Finally, the Libyan legislature has the power to appoint members of the Board of Directors for LFICO and to fix

their salaries, and the Board of LFICO is subordinate to the Libyan legislature. *Id.* On these facts, the Court finds LFICO more similar to the instrumentality in *TMR* than the instrumentality in *First Investment Corp.* LFICO is sufficiently close to the Libyan government such that it can be considered an agent of the government, and LFICO is thus not entitled to due process as a "person" under the Fifth Amendment. *See TMR*, 411 F.3d at 326. Because LFICO is not entitled to due process, the Court concludes it is subject to personal jurisdiction in this Court.

## IV. CHOICE OF LAW ANALYSIS

Defendants next argue that even if the Court has subject matter jurisdiction of this action and LFICO is subject to personal jurisdiction, the Receiver's claims wrongly rely on TUFTA. *See* Defs.' Mot. Dismiss 39–45. Defendants assert that under the "most significant relationship" test, Swiss fraudulent transfer law should apply to this dispute. *Id.* at 40–46. The Court disagrees.

The Court has previously conducted a thorough choice of law analysis in a Stanford TUFTA action in which defendants asserted Antiguan law governed the dispute. *See* Jan. 22, 2013 Order [909] (the "Net-Winners Order"), *in Janvey v. Alguire*, Civil Action No. 3:09-CV-0724-N (N.D. Tex. filed Apr. 20, 2009). There, the Court laid out the relevant choice of law principles, including the requirement that the Court identify and disregard any false conflicts of law.[7] *Id.* at 6–7. The Court also outlined the parties relevant contacts,

---

[7]"A false conflict occurs where, although the laws of two possibly interested states might substantively conflict, only one state has an actual interest in the dispute." Net-Winners Order 10 (citing *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 422 (Tex. 1984)).

including the still-relevant conclusion that the Receiver's relevant contact is Texas. *Id.* at 8–9. As to the transferees, the Court determined each transferee's contact should be individually determined. *Id.* at 10. Finally, and most importantly, the Court determined that the purported conflict between Antiguan and Texas law was a false conflict. *Id.* at 10–11.

The Court's false conflict conclusion was based on Antigua's lack of a legitimate interest in the dispute. *Id.* at 11. The Court noted that although SIB was located in Antigua and was an Antiguan corporation, the Stanford Ponzi scheme in reality operated as a single entity from Houston, Texas. *Id.* The Court also found that while Antigua may have a legitimate interest in protecting its own citizens from rescission of alleged fraudulent transfers, no Antiguan citizen had asserted a right to application of Antiguan law on that basis. *Id.* Thus, even despite SIB's locus and incorporation in Antigua, the Court concluded Antigua had no interest in the dispute. *Id.* The Fifth Circuit subsequently affirmed that conclusion. *See Janvey v. Brown*, 767 F.3d 430, 434–36 (5th Cir. 2014).

Thus, for the same reasons discussed in the Net-Winners Order and *Brown*, the Court determines Switzerland lacks a legitimate interest in this dispute. Defendants attempt to distinguish the Net-Winners Order by arguing that here, Switzerland "has a strong interest in the regulation of financial transactions with Swiss institutions." Defs.' Reply 25. But Defendants suggest no principled reason why Switzerland has any greater interest in regulating its Stanford-based institutions than did Antigua. Moreover, the disputed funds do not belong to the Swiss banks, they belong either to the Receiver or to LFICO. Thus, no Swiss entity has a plausible claim to any of the disputed funds in this action. The Court thus

concludes, in line with the Net-Winners Order, that Switzerland lacks a legitimate interest in this action.  The conflict between Swiss and Texas law is a false conflict, and the Court applies TUFTA.

### V. THE RECEIVER ADEQUATELY PLEADS HIS CLAIMS AGAINST LFICO

Defendants argue that even if TUFTA applies, LFICO is entitled to partial dismissal of the Receiver's TUFTA claim, and to complete dismissal of his unjust enrichment claim. The Court addresses each contention in turn.[8]

#### A. The Receiver Adequately Pleads His TUFTA Claims Against LFICO

Defendants first contend LFICO is entitled to partial dismissal of the Receiver's TUFTA claims because the complaint indicates that LFICO took its transfers in good faith, and it provided reasonably equivalent value to the extent the transfers were in satisfaction of a contractual debt.  *See* Defs.' Mot. Dismiss 51–53.  Defendants acknowledge the Court may only grant dismissal based on this defense if it appears clearly on the face of the pleadings. *Id.* at 51 (citing *Janvey v. Alguire*, 2011 WL 7047035, at *7 (N.D. Tex. 2011)).  After considering the pleadings, the Court concludes the TUFTA affirmative defense does not appear clearly on their face.  At this stage, Defendants have not carried their burden in establishing they took the disputed transfers in good faith and for reasonably equivalent value.

---

[8]Defendants also raise Rule 12(b)(6) arguments as to the Receiver's claims against LIA.  Because the Court has determined it does not have subject matter jurisdiction over any claims against LIA, the Court does not address the Rule 12(b)(6) arguments.

### *B. The Receiver Adequately Pleads His Unjust Enrichment Claim Against LFICO*

Lastly, Defendants contend that the Receiver fails to allege any facts suggesting LFICO was unjustly enriched by its receipt of funds from Stanford.  To the contrary, the Receiver makes a number of allegations as to this claim, including that LFICO was aware of the Stanford scheme earlier than other investors, and was thus able to withdraw its proceeds and avoid a more substantial loss than other investors suffered.  *See* Second Am. Compl. ¶ 52 [134].  Because Defendants' argument for dismissal of the unjust enrichment claim requires resolution of factual questions, the Court declines to dismiss the claim at this stage.

### CONCLUSION

Based on the foregoing, the Court concludes it lacks jurisdiction over the Receiver's claims against LIA and dismisses them without prejudice.  The Court denies Defendants' motion to dismiss as to the Receiver's claims against LFICO.  Because the Receiver's claims against LIA would continue to suffer from the same defect, the Court denies him leave to replead.  The Court also denies Defendants' motion to strike the Spindler Declaration.

Signed May 12, 2015.

David C. Godbey
United States District Judge