# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————

No. 15-10545
Cons. w/ No. 15-10548

United States Court of Appeals
Fifth Circuit

**FILED**

October 26, 2016

Lyle W. Cayce
Clerk

———————

RALPH S. JANVEY, In His Capacity as Court-Appointed Receiver for the
Stanford International Bank, Limited, Et Al,

> Plaintiff - Appellant

v.

LIBYAN INVESTMENT AUTHORITY,

> Defendant - Appellee

———————

Cons. w/ No. 15-10548

RALPH S. JANVEY, In His Capacity as Court-Appointed Receiver for the
Stanford International Bank, Limited, Et Al,

> Plaintiff - Appellee

v.

LIBYAN FOREIGN INVESTMENT COMPANY,

> Defendant - Appellant

———————

Appeals from the United States District Court
for the Northern District of Texas

———————

No. 15-10545
Cons. w/ No. 15-10548

Before WIENER, PRADO, and OWEN, Circuit Judges.

PER CURIAM:

Ralph S. Janvey, the court-appointed receiver ("the receiver") for a Ponzi scheme orchestrated by Allen Stanford (the "Stanford scheme"), brought claims against the Libyan Investment Authority ("LIA") and the Libyan Foreign Investment Company ("LFICO") in the district court, seeking to recover the proceeds of certificates of deposit ("CDs") previously transferred to LFICO by the Stanford International Bank, Ltd. ("SIB"). LIA and LFICO moved to dismiss the receiver's claims, insisting that they were immune from the court's jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"). The receiver opposed dismissal, asserting that the commercial activity exception to FSIA immunity applied. After the parties conducted limited jurisdictional discovery, the district court ruled that LIA was immune but that LFICO was not. Both the receiver and LFICO timely filed appeals, which have been consolidated. We affirm in part and vacate and remand in part.

I.

FACTS & PROCEEDINGS

Stanford and his associates perpetrated the Stanford scheme through a group of entities (collectively, the "Stanford entities") that, *inter alia*, sold sham CDs issued by SIB to unsuspecting investors. The Stanford entities promised those investors that the CDs from SIB would yield extraordinarily high rates of return. Rather than investing the funds they received from later investors, however, the Stanford entities paid those funds to earlier investors, redeeming their maturing CDs. In so doing, the Stanford entities made it appear that the

CDs from SIB were producing the phenomenal rates of return they had promised.[1]

In early 2009, the Securities and Exchange Commission ("SEC") filed suit against the Stanford entities, including SIB. The Stanford entities were then placed in receivership, and Janvey was appointed their receiver. The receiver is responsible for bringing claims on behalf of the Stanford entities to recover assets for distribution to their defrauded investors.

The instant consolidated appeals relate to the Stanford entities' transfer of funds to LFICO, an earlier investor that had redeemed some of its maturing CDs.

In 2006, LFICO had developed relationships with SIB, a Stanford entity based in Antigua, and Stanford Group (Suisse) S.A. ("SGS"), a Stanford entity based in Switzerland. LFICO's relationship with SIB related solely to its purchase of $138 million in CDs from SIB. LFICO's relationship with SGS related solely to a discretionary management agreement between itself and SGS, under which SGS managed $100 million of LFICO's funds in an account it held in Switzerland. The agreement was formed in Libya and governed by Swiss law.

These relationships were ongoing when, in 2007, two SGS financial advisors accompanied two LFICO analysts on a training program conducted by SIB. The program began and ended in Switzerland but included visits to Antigua and the United States—in particular, to Houston, Memphis, Washington, and Miami. Otherwise, LFICO's relationship with the Stanford entities did not include any other acts or activities in the United States.[2]

---

[1] In addition to transferring funds to earlier investors, the Stanford entities also transferred funds to other persons and entities, often for divergent purposes.

[2] In late 2008, the then-chairperson of LIA visited the United States for meetings of the International Monetary Fund ("IMF") and, while here, met with Stanford himself. There

In 2008, LFICO decided to divest its SIB-issued CDs, "given the size of [these] deposits and the problems facing the international financial market."[3] It instructed SGS in Switzerland to redeem its SIB-issued CDs as they matured rather than to repurchase them at that time. (In a single exception, LFICO instructed SGS to repurchase $50 million in CDs from SIB several months later.) SGS appears to have complied with these requests: As the CDs matured, SIB transferred their proceeds from its accounts in Canada and England to LFICO's accounts in Libya and Switzerland. None of these accounts was held in the United States.[4] When SIB entered receivership, LFICO had already received about $50 million in redemption proceeds, far less than it had paid for all of its CDs. As a result, it suffered a greater loss than any other investor in the Stanford scheme.

LFICO's only shareholder is LIA, whose only shareholder is Libya. Both LFICO and LIA are based in Libya. Unlike LFICO, LIA never purchased SIB-issued CDs, although it apparently considered doing so. LIA asserts that it was wholly uninvolved in LFICO's purchases and redemptions of the SIB-issued CDs.[5] LIA is not referenced in the discretionary management agreement between LFICO and SGS or in the CDs themselves, which were agreements

---

is no indication that they discussed LFICO's purchase, repurchase, or redemption of SIB-issued CDs.

[3] The management committee's decision to redeem the CDs in 2008 appears to have been unrelated to the analysts' visit to the United States in 2007.

[4] Although Stanford himself briefly visited Libya several days before SIB transferred the proceeds of these CDs to LFICO in 2009, this was months after LFICO had decided to divest and notified SIB that it would redeem its SIB-issued CDs rather than repurchase them as they matured.

[5] The receiver suggests that LFICO has stated that LIA was uninvolved with LFICO's *purchase* of SIB-issued CDs but has not stated that it was uninvolved with the *redemption* of those same CDs. This too closely parses LFICO's language, which actually states that LIA was uninvolved with LFICO's *investment* in SIB-issued CDs; use of the term "investment" is sufficiently broad to encompass both LFICO's purchase and subsequent redemption of the CDs.

between SIB and LFICO. After Stanford's arrest, the then-chief investment officer of LIA stated that LIA itself had not purchased any SIB-issued CDs but that he "suspect[ed] a[n] LIA affiliate or [s]ubsidiary may have [$]150 million at most" invested.[6]

In 2009, the receiver filed suit against investors, including LFICO, that had purchased SIB-issued CDs and later had redeemed them. He sought disgorgement of any proceeds of those CDs, but in *Janvey v. Adams*, this court precluded such claims, holding that the investors had a legitimate ownership interest in those proceeds.[7] The receiver then made new claims against some of those investors for fraudulent transfer and unjust enrichment. Eventually, he asserted such claims against LFICO and LIA, too, alleging that LFICO was LIA's alter ego. The receiver filed a motion for a preliminary injunction on those claims. The district court denied the receiver's motion, and we affirmed the district court's denial.

LIA and LFICO eventually filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) and (2), claiming that the district court lacked personal and subject matter jurisdiction because (1) they had presumptive immunity under the FSIA as agents or instrumentalities of a foreign state and (2) the commercial activity exception to immunity under the FSIA did not apply. The parties conducted jurisdictional discovery regarding whether LIA and LFICO engaged in activities that fall within the scope of the commercial activity exception under the FSIA.

When that discovery was complete, the district court denied the motion to dismiss as to LFICO. In so doing, it ruled that (1) LFICO had engaged in

---

[6] Notably, the Libyan-African Investment Portfolio ("LAP"), an entity similar to LFICO, also purchased SIB-issued CDs between 2007 and 2008. Unlike LFICO, however, it repurchased about $50 million in CDs from SIB as they matured in late 2008. As a result, SIB never transferred any proceeds to LAP.

[7] 588 F.3d 831, 834 (5th Cir. 2009).

commercial activity by purchasing, repurchasing, and redeeming the SIB-issued CDs and (2) this activity, which occurred outside the United States, had a "direct effect" on the United States because the Stanford scheme was based in the United States. The court concluded that the commercial activity exception to immunity under FSIA gave it personal and subject matter jurisdiction over LFICO.

The district court granted the motion to dismiss as to LIA. The court concluded that LIA had not engaged in commercial activity at all and that, although LFICO had engaged in such activity, its acts were not attributable to LIA. The court ruled that LFICO was not LIA's agent or alter ego in purchasing, repurchasing, or redeeming the SIB-issued CDs and that the proceeds of those CDs were not redeemed for LIA's benefit. Both LFICO and the receiver then appealed.

## II.

### ANALYSIS

### A.  STANDARD OF REVIEW

We have appellate jurisdiction over any final order that grants immunity under the FSIA[8] and over any collateral order that denies it.[9] We also have pendent appellate jurisdiction over any closely related issues.[10] In exercising that jurisdiction, we review the district court's conclusions of law *de novo*,[11]

---

[8] 28 U.S.C. § 1291.

[9] *See Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo General del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.C.*, 923 F.2d 380, 385 (5th Cir. 1991).

[10] *See Walter Fuller Aircraft Sales, Inc., v. Rep. of Phil.*, 965 F.2d 1375, 1387 (5th Cir. 1992) ("In the exercise of [this Court's] discretion and in the interest of judicial economy . . . , we may consider claims under our pendent appellate jurisdiction that are closely related to the order properly before us."); *Morin v. Caire*, 77 F.3d 116, 119 (5th Cir. 1996).

[11] *Bd. of Regents of Univ. of Tex. Sys. v. Nippon Tel. & Tel. Corp.*, 478 F.3d 274, 279 (5th Cir. 2007); *see Ynclan v. Dep't of Air Force*, 943 F.2d 1388, 1390 (5th Cir. 1991).

and, to the extent it makes any findings of fact,[12] we review them for clear error.[13] A finding of fact is clearly erroneous if it is inconsistent with the record in its entirety.[14] Such a finding may be clearly erroneous if (1) it is not based on "substantial evidence," (2) it is based on a misinterpretation of the evidence, or (3) it is inconsistent with "the preponderance of credible testimony."[15] If the district court's conclusions of law "affected" its findings of fact, "remand is the proper course unless the record permits only one resolution of the [fact]."[16]

These appeals require us to determine whether there is any basis for personal and subject matter jurisdiction over LIA and LFICO. The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in [federal and state] courts."[17] It furnishes both the immunity itself, which applies to any "foreign state,"[18] and the only exceptions to that immunity.[19] If an exception applies, the FSIA also specifies the only basis for personal and subject matter jurisdiction over the foreign state. That jurisdiction extends to "any nonjury civil action against a foreign state . . . as to any claim for relief in personam . . . ."[20] If no exception applies, there is no other basis for personal or subject matter jurisdiction over a foreign state.[21]

---

[12] *Bd. of Regents of Univ. of Tex. Sys.*, 478 F.3d at 279; *see Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 171–72 (5th Cir. 1994).

[13] *Moran*, 27 F.3d at 171–72.

[14] *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 569 (5th Cir. 2011).

[15] *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015) (internal quotation marks omitted).

[16] *Id.* at 596 (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982)).

[17] *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 & n.2 (1989).

[18] 28 U.S.C. §§ 1602–11.

[19] *Id.* § 1605(a).

[20] *Id.* § 1330(a).

[21] *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 489 (1983). *See also Argentine Republic*, 488 U.S. at 435 n.3 ("Subsection (b) of 28 U.S.C. § 1330 provides that '[p]ersonal

The parties claiming immunity under the FSIA—here, LIA and LFICO—have the initial burden of persuasion that they are foreign states and therefore entitled to a presumption of immunity.[22] If they bear that burden, then the party opposing immunity—here, the receiver—has the burden of producing evidence that LIA and LFICO fall within an exception enumerated in the FSIA, refuting the presumption of immunity.[23] If the receiver bears his burden, LIA and LFICO then have the ultimate burden of persuasion that the exception does not apply to them and that they are entitled to immunity.[24]

B.   WHETHER LFICO AND LIA ARE "FOREIGN STATES" UNDER THE FSIA

The parties agreed that both LIA and LFICO are "foreign states" under the FSIA. Relying on the parties' agreement, the district court determined that LIA and LFICO "qualify as foreign states." Subject matter jurisdiction, however, "can never be forfeited or waived."[25] We therefore "have an independent obligation to determine whether [it] exists, even in the absence of

---

jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject-matter] jurisdiction under subsection (a) where service has been made under [28 U.S.C. § 1608].' Thus, personal jurisdiction, like subject-matter jurisdiction, exists only when one of the exceptions to foreign sovereign immunity . . . applies." (alterations in original)).

[22] *See United States v. Moats,* 961 F.2d 1198, 1205 (5th Cir. 1992).

[23] *Id.*

[24] *Id.*

[25] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Importantly, the subject matter jurisdiction inquiry under the FSIA involves determining first whether a party is a "foreign state" to which the Act applies, and then whether any exception to the presumption of foreign sovereign immunity applies under the circumstances. *See Verlinden*, 461 U.S. at 488–89. Whether the party is a "foreign state" clearly cannot be waived by the parties, just as is the case with any typical question regarding subject matter jurisdiction. A foreign state entitled to immunity under the FSIA, however, may waive its immunity. *See* 28 U.S.C. § 1605(a)(1) (providing that a party can expressly or implicitly waive its immunity from the jurisdiction of the United States courts). In this case, when we state that subject matter jurisdiction can never be waived, our statement applies only to whether a party is a "foreign state" under the FSIA.

a challenge from any party."[26] Accordingly, we must determine whether LIA and LFICO are "foreign states" under the FSIA.

In the context of the FSIA, the term "foreign state" refers not only to the state itself, *viz.*, the "body politic that governs a particular territory,"[27] but also to its "agenc[ies] or instrumentalit[ies]."[28] Absent a clear distinction between the terms "agency" and "instrumentality,"[29] they are read together or treated interchangeably.[30]

An agency or instrumentality of a foreign state is a separate entity, "corporate or otherwise," that is either (1) majority owned by a foreign state or (2) an "organ" of a foreign state.[31] There is a distinction between those agencies or instrumentalities that qualify because they are "organs" of a foreign state

---

[26] *Arbaugh*, 546 U.S. at 514.

[27] *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010).

[28] 28 U.S.C. § 1603(a).

[29] *See Agency*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "agency," in relevant part, as "[a]n official body, esp. within the government, with the authority to implement and administer particular legislation"); *see Instrumentality*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "instrumentality," in relevant part, as "[a] means or agency through which a function of another entity is accomplished, such as a branch of a governing body").

[30] We have previously explained: "The use of the single term 'agency' for two purposes in the context of this case may cause some confusion. The FSIA uses it to determine whether an 'agency' of the state may potentially qualify for foreign sovereign immunity itself under the FSIA. This is a completely different question from . . . whether or not [such an agency] enjoyed an alter ego relationship with the [foreign state] so that it could bind [the foreign state as a result of its acts]. Although such an alter ego relationship may be described in terms of 'agency,' it is a completely different inquiry than that which might be conducted under [the FSIA's 'agency or instrumentality' requirement]. . . . [T]he level of state control required to establish an 'alter ego' relationship is more extensive than that required to establish FSIA 'agency.'" *Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 176 n.5 (5th Cir. 1989).

[31] 28 U.S.C. § 1603(b) ("An 'agency or instrumentality of a foreign state' means any entity . . . (1) which is a separate legal person, corporate or otherwise, and . . . (2) which is an organ of a foreign state . . . *or* a majority of whose shares or other ownership interest is owned by a foreign state . . . ." (emphasis added)).

and those that qualify because they are "majority owned" by one.[32] In some instances, however, an agency or instrumentality may be both and thus qualify as either.

1. MAJORITY OWNED BY A FOREIGN STATE

The Supreme Court has clarified that, because "[c]ontrol and ownership . . . are distinct concepts," "[m]ajority ownership by [the] foreign state, not control, is the benchmark."[33] As "only direct ownership" counts,[34] "a subsidiary of an [agency or] instrumentality [of the state] is not itself entitled to [such] status."[35] Therefore, "[a] corporation is an [agency or an] instrumentality of a foreign state under the FSIA only if the foreign state *itself* owns a majority of the corporation's shares."[36] It is not an agency or instrumentality on the basis of majority ownership, however, if the "the foreign state does not own a majority of its shares but does own a majority of the shares of a corporate parent one or more tiers above the subsidiary."[37]

LIA is majority owned by Libya itself and thus is an agency or instrumentality of Libya.[38] LFICO, however, does not qualify on that basis because it is not majority owned by Libya directly, but by LIA. LFICO is merely a subsidiary of LIA, and that is not sufficient.

---

[32] *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 846 (5th Cir. 2000) ("[B]ecause we conclude that [the entity] is an organ of a foreign state, we need *not* consider [the] ownership requirements.").

[33] *Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003).

[34] *Id.* at 474.

[35] *Id.* at 473. The Supreme Court discusses only "instrumentalities" in this context, and it does not distinguish agencies from instrumentalities. As discussed above, these appear to be synonymous.

[36] *Id.* at 477 (emphasis added).

[37] *Id.* at 471.

[38] As another panel noted, LIA is "an agency of the Libyan government." *Janvey v. Libyan Inv. Auth.*, 478 F. App'x 233, 236 (5th Cir. 2012).

No. 15-10545
Cons. w/ No. 15-10548

2.    ORGAN OF A FOREIGN STATE

LFICO could qualify as an agency or instrumentality, however, if it is an *organ* of Libya. We have suggested that there is no clear test for determining whether an entity is an organ of a state but that the following factors are useful: "(1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law."[39] Considering whether an entity is an "organ" is, in some respects, similar to considering whether it is an "agent." (We note that the term "*agent*" should not to be confused with the term "agency" in the phrase "*agency or instrumentality*.")

Because the parties agreed that LFICO is a "foreign state" under the FSIA, they did not address whether LFICO is an organ, and thus an agency or instrumentality, of Libya. The district court did determine, in another context, that LFICO was not *LIA's* agent but was *Libya's* agent. The court explained that "there is a sufficient connection between LFICO and [Libya] such that LFICO can be considered Libya's agent."[40] In so doing, the court determined: "LFICO operates solely in the national interest of Libya"; "LFICO possesses 'special status and is treated as an organ of . . . Libya"; "LFICO is comprised in large part of government representatives"; and "the Libyan legislature has the power to appoint members of . . . LFICO['s board] and to fix their salaries, and [its board] is subordinate to the Libyan legislature."

---

[39] *Bd. of Regents of Univ. of Tex. Sys.*, 478 F.3d at 279 (alteration in original) (quoting *Kelly*, 213 F.3d at 846–47 (5th Cir. 2000))

[40] Notably, LFICO is owned by LIA, not by Libya proper.

The district court, however, erred by relying on a description of the act that created LFICO initially rather than the description of the subsequent act that transferred LFICO to LIA. The subsequent act disentangled LFICO from Libya itself. As a result, LIA became—and remains—Libya's subsidiary, and LFICO became—and remains—LIA's subsidiary. This is significant because, as with subsidiaries, "duly created [agencies or] instrumentalities of a foreign state are to be accorded a presumption of independent status."[41] The party opposing immunity—here, the receiver—"can overcome that presumption . . . by demonstrating that the [agency or] instrumentality is the agent or alter ego of the foreign state."[42] The theories underlying alter egos and agents are "distinct" and, for this reason, are not to be applied "as if they were interchangeable."[43] Alter egos are created equitably; agents are created contractually.[44] Both, however, are bases for overcoming the presumption that an agency or instrumentality of a foreign state is separate from the foreign state itself.[45]

LIA is majority owned by Libya proper and therefore an agency or instrumentality of a foreign state. In contrast, LFICO is not majority owned by Libya proper. As noted above, the parties agreed that, in addition to LIA, LFICO is a foreign state under the FSIA, so the parties did not develop the record on the precise issue of whether LFICO is an *organ* of Libya and thus a

---

[41] *First Inv. Corp. of Marsh. Is. v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 752 (5th Cir. 2012) (quoting *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 627 (1983)).

[42] *Dale v. Colagiovanni*, 443 F.3d 425, 429 (5th Cir. 2006); *see First Inv. Corp. of Marsh. Is.*, 703 F.3d at 753.

[43] *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 358 (5th Cir. 2003).

[44] *Id.* at 359 ("The laws of agency, in contrast, are not equitable in nature, but contractual, and do not necessarily bend in favor of justice.").

[45] *First Nat'l City Bank*, 462 U.S. at 633.

No. 15-10545
Cons. w/ No. 15-10548

"foreign state" under the FSIA. Accordingly, we vacate the district court's ruling that it had jurisdiction over the claims against LFICO under the FSIA and remand for development of the factual record on this issue and for a determination whether LFICO is an organ, and thus an agent or instrumentality, of Libya under the FSIA.

C.    WHETHER THE CLAIMS AGAINST LFICO ARE SUBJECT TO THE COMMERCIAL ACTIVITY EXCEPTION TO THE FSIA

If we were to assume *arguendo* that LFICO is an agency or instrumentality of Libya proper and therefore presumptively entitled to immunity under the FSIA, there would be no basis for jurisdiction over the receiver's claims against LFICO under the commercial activity exception to the FSIA. The FSIA provides an exception to sovereign immunity "in any case in which the action is based upon commercial activity that has a jurisdictional nexus with the United States."[46] The commercial activity exception contains three clauses, each identifying a type of act that is sufficiently connected to the United States to satisfy the jurisdictional nexus requirement: (1) "a commercial activity carried on in the United States by the foreign state"; (2) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; and (3) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."[47]

The parties dispute whether LFICO's activity—purchasing, repurchasing, and redeeming SIB-issued CDs—fell within any of the clauses of FSIA's commercial activity exception. LFICO argues that the district court erred in determining that it had jurisdiction to hear the receiver's claims

---

[46] *Stena Rederi AB*, 923 F.2d at 386 (citing 28 U.S.C. § 1605(a)(2)).

[47] 28 U.S.C. § 1605(a); *see Stena Rederi AB*, 923 F.2d at 386.

against it under *any* clause of the commercial activity exception. Because the district court based its decision on the third clause, we begin there.

1.    THIRD CLAUSE

The third clause of the exception applies when a claim "is [*i*] based . . . upon an act outside . . . of the United States [*ii*] in connection with a commercial activity"[48]—"either a regular course of commercial conduct *or* a particular commercial transaction or act"[49]—"of the foreign state elsewhere and [*iii*] that act causes a direct effect in the United States."[50] The parties do not dispute that the receiver's claim is based "upon an act outside the territory of the United States in connection with [LFICO's] commercial activity [outside the United States]."[51]

The district court determined, however, that the third clause applied because it concluded that LFICO's acts caused a direct effect in the United States. An effect is "direct" if it follows as an immediate consequence of the foreign state's activity.[52] "[A] consequence is 'immediate' if no intervening act breaks 'the chain of causation leading from the asserted wrongful act to its

---

[48] 28 U.S.C. § 1605(a).

[49] *Id.* § 1603(d) (emphasis added) (defining "commercial activity").

[50] *Id.* § 1605(a)(2).

[51] *Id.* There is a "difference between [claims] 'based upon' *commercial activity* and [those] 'based upon' *acts performed 'in connection with' such activity*." *Saudi Arabia v. Nelson*, 507 U.S. 349, 358 (1993) (emphasis added). The third clause of the commercial activity exception provides that the claim must be "based . . . upon an *act* outside the territory of the United States *in connection with* a commercial activity of the foreign state elsewhere" and that the act "causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2) (emphasis added). In contrast, the first clause specifies that the claim must be "based upon a *commercial activity . . . by the foreign state*." *Id.* (emphasis added). Because "[d]istinctions among descriptions juxtaposed against each other are naturally understood to be significant," the first clause "calls for something more than a mere connection with, or relation to, commercial activity." *Nelson*, 507 U.S. at 357–58.

[52] *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 618 (1992).

impact in the United States.'"[53] In considering the effect, we must "isolate those specific acts of the [agency or instrumentality] that form the basis of the plaintiff's [claims]."[54] As the Second Circuit has noted, "even if . . . a particular effect might be foreseeable," such an effect is not "direct" if it "hinge[s] on third parties' independent . . . conduct."[55] "[T]he mere fact that [an agency or instrumentality]'s commercial activity outside of the United States caused . . . financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the United States."[56] Such an injury will constitute a direct effect only if the agency or instrumentality of a foreign state causes the injury through its failure to perform an obligation that it was required to perform in the United States.[57]

---

[53] *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1133 (9th Cir. 2012) (quoting *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1083 (9th Cir. 2001)); *see also Odhiambo v. Republic of Kenya*, 764 F.3d 31, 41 (D.C. Cir. 2014).

[54] *de Sanchez v. Banco Cent. de Nicar.*, 770 F.2d 1385, 1391 (5th Cir. 1985); *see Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 75 (2d Cir. 2010) ("[T]he requisite immediacy is lacking where the alleged effect depends crucially on variables independent of the conduct of the [agency or instrumentality]." (internal quotation marks omitted)).

[55] *Virtual Countries v. Republic of S. Afr.*, 300 F.3d 230, 238 (2d Cir. 2002) ("Defining 'direct effect' to permit jurisdiction when [an agency or instrumentality]'s actions precipitate reactions by third parties, which reactions then have an impact on a plaintiff, would foster uncertainty in both [agencies or instrumentalities] and private counter-parties. Neither could predict when an action would create jurisdiction, which would hinge on third parties' independent reactions and conduct, even if in individual cases, such as the one at bar, a particular effect might be foreseeable. To permit jurisdiction in such cases would thus be contrary to the predictability interest fostered by the [FSIA].").

[56] *Guirlando*, 602 F.3d at 78; *see also Westfield v. Fed. Republic of Ger.*, 633 F.3d 409, 417 (6th Cir. 2011) ("[A]n American entity's mere financial loss is insufficient to establish a direct effect in the United States."). If financial injury to a United States citizen were considered a sufficiently direct effect, "the commercial activity exception would in large part eviscerate the FSIA's provision of immunity for foreign states." *Antares Aircraft, L.P. v. Fed. Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993).

[57] *Weltover*, 504 U.S. at 619; *see Energy Allied Int'l Corp. v. Petroleum Oil & Gas Corp. of S. Afr.*, No. H-08-2387, 2009 WL 2923035, at *4 (S.D. Tex. Sept. 4, 2009); *Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 896 (5th Cir. 1998) (noting that there was a direct effect in the United States because an agency or instrumentality of the foreign state failed to perform its obligation to transfer assets to an entity in the United States); *Callejo v. Bancomer, S.A.*, 764 F.2d 1101 (5th Cir. 1985) (same); *UNC Lear Servs., Inc. v.*

No. 15-10545
Cons. w/ No. 15-10548

The district court determined that LFICO's acts, which occurred outside the United States, had a "direct effect" in the United States. The district court explained that, "by doing business with SIB in Antigua, LFICO was in reality doing business with Stanford in [the United States]." It concluded that, "as an immediate consequence of LFICO's investments [in Antigua], the [U.S.]-based Stanford Ponzi scheme slipped further into insolvency and received funds it needed to keep its scheme afloat." This assumption is erroneous.

LFICO purchased, repurchased, and redeemed the CDs from SIB, which was based in Antigua; all of LFICO's acts occurred in Switzerland and Libya; and all of SIB's acts occurred in Antigua, Canada, and England. LFICO had nothing to do with SIB's transfer of funds to or from other Stanford entities as part of the scheme. The district court observed that "[m]oney put into and taken out of SIB's coffers in Antigua was money being funneled through Stanford's [U.S.]-based enterprise." It did not state that *LFICO* was funneling that money. In fact, it did not identify who was doing the funneling but ducked that issue by relying on the passive voice: "[m]oney . . . was being funneled."

LFICO acted only pursuant to its obligations under the SIB-issued CDs, which constituted agreements between LFICO and SIB. Those instruments did not require any act in the United States, much less the act of funneling money through the Stanford scheme or any Stanford entities in the United States. Accordingly, the district court erred in deciding that the third clause of the commercial activity exception applied to the receiver's claims against LFICO.

2.   FIRST AND SECOND CLAUSES

The receiver asserts that the district court erred in determining that the first and second clauses of the commercial activity exception do not apply.

---

*Kingdom of Saudi Arabia*, 581 F.3d 210, 218–19 (5th Cir. 2009) (same); *Westfield*, 633 F.3d at 415 (noting that there was no direct effect in the United States because the foreign state "had not obligated itself to do anything in the United States"); *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 90–91 (D.C. Cir. 2005).

Those clauses provide exceptions to sovereign immunity when "the action is based [1] upon a commercial activity carried on in the United States by the foreign state . . . or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere . . . ."[58] The receiver contends that SIB was, in fact, the Stanford scheme itself. But, as discussed above, LFICO's commercial activity was limited to its obligations and rights under the SIB-issued CDs, which were contracts between LFICO and SIB. The CDs did not require any activity in the United States. LFICO properly assumed that its relationship was with SIB and that SIB was what it represented itself to be, *i.e.*, a bank based in Antigua. Even though a few of LFICO's analysts participated in SIB's training program, which included a visit to the United States, there is nothing to suggest that this activity was related to LFICO's relevant acts made pursuant to its obligations or rights under the SIB-issued CDs.[59] Thus, if LFICO is an agency or instrumentality of a foreign state, the commercial activity exception would not strip it of its presumptive immunity under the FSIA.

D.    WHETHER THE CLAIMS AGAINST LIA ARE SUBJECT TO THE COMMERCIAL ACTIVITY EXCEPTION UNDER THE FSIA

The receiver insists that, even though LIA did not purchase, repurchase and redeem SIB-issued CDs, or receive proceeds of such CDs itself, LFICO did and LFICO's acts were attributable to LIA. He avers specifically that LFICO is LIA's alter ego or agent and that LIA was the beneficiary of the transfers from SIB to LFICO. He concludes that, as with LFICO, the FSIA's commercial activity exception applies to his claims against LIA.

---

[58] 28 U.S.C. § 1605(a)(2).

[59] *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 533 (5th Cir. 1992) ("Isolated or unrelated commercial actions by a foreign sovereign in the United States do not authorize the exception.").

1. AGENT OR ALTER EGO

The parties do not appear to dispute the relationship between LIA and Libya. Instead, they dispute the relationship between LIA and LFICO. Specifically, they disagree on whether LFICO's acts are attributable to LIA. As we observed above, "[a] corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary . . . ."[60] "The fact that the shareholder is [an agency or instrumentality of a foreign state] does not change the analysis."[61] Subsidiaries that are "established as juridical entities distinct and independent . . . should normally be treated as such."[62] In the context of the FSIA, a court must apply "the general rules regarding corporate formalities."[63] For this reason, "duly created [agencies or] instrumentalities of a foreign state are to be accorded a presumption of independent status."[64] "A plaintiff can overcome that presumption, however, in certain circumstances by demonstrating that the instrumentality is the agent or alter ego of the foreign state."[65] Yet, the theories underlying alter egos and agents are "distinct" and are therefore not to be applied "as if they were interchangeable."[66] Again, alter egos are created equitably; agents are created contractually.[67] Each is a basis for overcoming the presumption that an agency or instrumentality of a foreign state is

---

[60] *Dole Food Co.*, 538 U.S. at 475.

[61] *Id.*

[62] *First Nat'l City Bank*, 462 U.S. at 626–27.

[63] *Dole Food Co.*, 538 U.S. at 476.

[64] *First Inv. Corp. of Marsh. Is.*, 703 F.3d at 752–53 (quoting *First Nat'l City Bank*, 462 U.S. at 627).

[65] *Dale*, 443 F.3d at 429; *see First Inv. Corp. of Marsh. Is.*, 703 F.3d at 753.

[66] *Bridas*, 345 F.3d at 358.

[67] *Id.* at 359 ("The laws of agency, in contrast, are not equitable in nature, but contractual, and do not necessarily bend in favor of justice.").

separate from the foreign state itself.[68] In both instances, the analysis is conducted with reference to federal law, not foreign law or state law.[69]

To determine if one entity is the *alter ego* of another, "[t]he corporate veil may be pierced to hold a[ parent] liable for the [acts] of its [subsidiary] only if (1) the [parent] exercised complete control over the [subsidiary] with respect to the [acts] at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil."[70] In contrast, when determining whether one entity is the *agent* of another, it is necessary to consider "whether the [parent] exercises day-to-day control over the [subsidiary]."[71] In the context of the commercial activity exception, we further consider "whether the commercial activity is 'of the foreign state.'"[72] Thus, both the principal-agent and alter ego relationships require an element of control.

A declaration provided by LIA, and which the district court credited, states:

> LFICO has always operated independently of LIA as described in the [Layas and Mokhtar declarations]. For the avoidance of doubt: (a) LIA has no right to manage LFICO's investments directly. (b) LIA has no right to actually own and deal directly with LFICO's assets. (c) LIA has no right to hold LFICO's assets as LIA's own. (d) LIA has no right to assign LFICO's personnel, choose its managers, prepare its accounts,

---

[68] *First Nat'l City Bank*, 462 U.S. at 633.

[69] *See, e.g., id.* at 622 n.11 ("[M]atters bearing on the nation's foreign relations should not be left to divergent and perhaps parochial state interpretations." (internal quotation marks omitted)).

[70] *Bridas*, 345 F.3d at 359.

[71] *Dale*, 443 F.3d at 429.

[72] *Id.*

> or determine with what third parties LFICO will
> contract for services.[73]

Considering this declaration offered by LIA, it is apparent that LIA and LFICO are entitled to the presumption that they are separate entities. There is nothing to indicate that LIA had or exercised any significant control over LFICO, either generally or with specific regard to LFICO's purchase, repurchase, or redemption of the SIB-issued CDs or the receipt of proceeds from such CDs. Any control that LIA might have exercised was not nearly enough to justify disregarding the legal distinction between them. The district court did not err in determining that LFICO was not LIA's agent or its alter ego.

2.    TRANSFER BENEFICIARY UNDER TUFTA

The receiver further argues that LIA is liable for the transfer from SIB to LFICO because, under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), LIA was the "person" for whose benefit the transfer was made. The district court rejected this contention.

TUFTA provides that a transfer from a debtor to a creditor is fraudulent if made with actual intent to hinder, delay, or defraud any other creditor of that debtor.[74] In relevant part, it states that either "the first transferee of the asset or the person for whose benefit the transfer was made" may be held liable for such a transfer.[75] Regardless of whether LIA is a beneficiary of the transfer, under TUFTA, we must consider whether the commercial activity exception to the FSIA provides a source of subject matter jurisdiction over such a claim.

---

[73] The receiver submitted his own contrary declaration, but the district court discredited it and its reasons for doing so were sound.

[74] TEX. BUS. & COM. CODE ANN. § 24.005.

[75] *Id.* § 24.009(b)(1).

As discussed above, the commercial activity exception focuses on the acts or activities of the agency or instrumentality of the foreign state. The receiver's TUFTA claim is based on *SIB*'s transfer of proceeds to *LFICO*, allegedly for the benefit of LIA. As alleged, LIA neither made nor received the transfer. It merely benefited from it.

Notably, "[TUFTA] and the . . . Bankruptcy Code are of common ancestry; cases under one are considered authoritative under the other."[76] Both refer to the person "for whose benefit [a] transfer was made."[77] In the context of bankruptcy, a transfer beneficiary is typically the guarantor of a debt that was extinguished by the transfer.[78] The obligation of the insolvent debtor in such a circumstance would generally be the guarantor's obligation, as well. Absent the transfer from debtor to creditor, the guarantor would have had to make the transfer itself. As the transfer beneficiary, it avoids that obligation.

The receiver nevertheless insists that when a debtor makes a transfer to a creditor, that creditor's shareholder may also be considered a transfer beneficiary. The receiver relies on *Esse v. Empire Energy III, Ltd.*[79] and *Citizens National Bank of Texas v. NXS Construction, Inc.*,[80] but both are inapplicable. The *Esse* court determined that shareholders were transfer beneficiaries because they had "'assented to and benefitted from these

---

[76] *GE Capital Commercial, Inc. v. Wright & Wright, Inc.*, No. 3:09-CV-572-L, 2009 WL 5173954, at *7 n.1 (N.D. Tex. Dec. 31, 2009).

[77] 11 U.S.C. § 550(a)(1); TEX. BUS. & COM. CODE ANN. § 24.009(b)(1).

[78] *See, e.g., In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 130 F.3d 52, 57 (2d Cir. 1997); *In re Columbia Data Prods., Inc.*, 892 F.2d 26, 29 (4th Cir. 1989); *see also* COLLIER ON BANKRUPTCY ¶ 550.02[4] (16th ed. 2011) ("Two frequently cited examples of an entity for whose benefit the transfer was made are (1) a third-party guarantor of the debtor whose liability is reduced by the debtor's payment of the guaranteed debt and (2) a third party whose debt is paid by the debtor (with payment going to the third party's creditor as the initial transferee).").

[79] 333 S.W.3d 166, 181 (Tex. App. 2010).

[80] 387 S.W.3d 74 (Tex. App. 2012).

transfers' and knowingly participated in the wrongdoing."[81] Those shareholders had also waived any argument that they were not transfer beneficiaries.[82] The *Citizens National Bank* court determined that a shareholder was a transfer beneficiary because the shareholder was actually involved with the transfer.[83]

By contrast, LIA insists that, without more, a shareholder is not a beneficiary of a transfer made to the corporation. It notes, for instance, that in *In re Hansen*, a bankruptcy court held that the creditor's majority shareholder was not a transfer beneficiary.[84] The court explained:

> Nothing in [§] 550(a)(1) [of the Bankruptcy Code] indicates that corporate form can be thrust aside and all voidable transfers to a corporation recovered from its shareholders on the mere assumption that shareholders somehow automatically "benefit" from such transfers. If corporate existence is to be observed, transfers cannot be recovered even from a shareholder who by virtue of his majority ownership ostensibly "controls" the corporation. Something more than mere status as a shareholder, officer, or director must be shown.
>
> The better view—and the one consistent with corporate law—is that shareholders, officers, and directors are not liable for transfers to their corporation unless they actually received distributions of the transferred property . . . or a showing can be made to pierce the corporate veil.[85]

This appears to be the right approach. When a debtor transfers assets to a creditor to satisfy a guaranteed debt, there are independent benefits: The

---

[81] 333 S.W.3d at 174.

[82] *Id*. at 181.

[83] 387 S.W.3d at 85.

[84] 341 B.R. 638, 644 (Bankr. N.D. Ill. 2006).

[85] *Id*. at 645–46 (citations omitted).

creditor, as transferee, receives the assets, and the guarantor, as the beneficiary, retains assets that he would otherwise have lost as a result of the debtor's insolvency. Another creditor might seek to recover either the assets transferred by the debtor or the assets saved by the creditor, or both. This is because the transferee and beneficiary have independent obligations. Here, only LFICO, as the transferee, has an obligation. LIA's obligation is merely derivative of that obligation, not independent of it. LIA did not receive an independent benefit as a result of the transfer from SIB to LFICO. Even if LIA itself owned and controlled LFICO's assets, either LIA or LFICO would have received the benefit of the transfer, but not both. Further, when a debtor transfers assets to a creditor to satisfy a guaranteed debt, the guarantor is involved as a party, or at least an independent obligor, to the contract giving rise to the transfer. But LIA was not a party to the subject contract.

As *Collier on Bankruptcy* explains, any "approach that permits recovery based merely on the intent of the debtor/transferor without any benefit being conferred on the third party results in the harsh outcome that the third party can be liable for the return of an avoidable transfer without having received any benefit, which is generally contrary to the disgorgement remedy of avoidance actions."[86]

Because LIA was not a transfer beneficiary under TUFTA, we do not consider LIA and LFICO's contention that TUFTA may not be applied extraterritorially. Neither do we consider whether, if LIA were a transfer beneficiary, its status as such would be a basis for jurisdiction under the FSIA.

---

[86] COLLIER ON BANKRUPTCY ¶ 550.02[4].

No. 15-10545
Cons. w/ No. 15-10548

III.

CONCLUSION

We hold that the FSIA provides no basis for jurisdiction over LIA. We therefore AFFIRM the district court's holding that it had no jurisdiction over the claims against LIA under the FSIA. However, we VACATE the district court's holding that it had jurisdiction over the claims against LFICO under the FSIA and REMAND to the district court for it to determine in the first place whether LFICO is an "organ" of Libya, and thus a "foreign state," under the FSIA.